In re **MADE IN DETROIT, INC., Debtor.**

No. 02–65108.

United States Bankruptcy Court, E.D. Michigan, Southern Division.

Sept. 22, 2003.

Thomas R. Morris, Shefferly, Silverman & Morris, West Bloomfield, MI, Robert D. Gordon, Bloomfield Hills, MI, Seymour N. Dubrinsky, Birmingham, MI, for Debtor.

## OPINION DENYING CONFIRMATION OF DEBTOR'S PLAN

MARCI BETH MCIVOR, Bankruptcy Judge.

This matter came before the Court on September 10 and 12, 2003, at a hearing on confirmation of competing plans of reorganization. At the conclusion of the hearing, the Court issued an opinion denying confirmation of the Debtor's Plan and con-

firming the Plan of the Official Committee of Unsecured Creditors. With regards to the Committee's Plan, the Court signed an Order Confirming the Committee's Plan. With regards to the Debtor's Plan, the Court stated that it would issue a written Opinion and Order to supplement its bench opinion.

### I

### UNDISPUTED FACTS

In 1997, the Debtor, Made in Detroit, Inc., purchased approximately 410 acres of real property (the "Property") for the purpose of development. The Property is located on the Detroit River in both Gibraltar and Trenton, Michigan, and it is the Debtor's only significant asset. For the next five years, the Debtor attempted to develop the Property. Due to problems in obtaining permits, the development was delayed. As a result of the long delay, the costs associated with pursuing the permits, and because Debtor was not generating income, the Debtor became delinquent in payments to secured creditors. In 2002, the primary secured creditor, Standard Federal, commenced a foreclosure action against the Debtor. As a result, on October 23, 2002, the Debtor filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code.[1]

On July 15, 2003, the Debtor filed its Third Amended Combined Plan and Disclosure Statement (the "Debtor's Plan"). The Plan provides that it will be funded via a nine million dollar loan from Kennedy Funding, Inc. and that the Kennedy loan is contingent on certain conditions precedent, including a $270,000 commitment fee and a $15 million valuation of the Property. Specifically, the Plan states:

---

1. Standard Federal subsequently assigned its claim to Gibraltar–Trenton Development Company, LLC.

On July 8, 2003, the Debtor received a draft of a Loan Commitment from Kennedy Funding for a loan in the amount of $9,000,000.00. The Debtor will receive a firm loan commitment from Kennedy Funding when the Debtor deposits $270,000.00 in an escrow account. The Debtor intends to obtain these funds through loans or capital contributions from shareholders and/or loans from other persons. Based upon willingness expressed by its shareholders, the Debtor does not anticipate any difficulties in obtaining the funds necessary for this transaction. The monies in the escrow account will be applied towards the closing fee if the Debtor fails to close the loan. Otherwise, the fees will be paid from the loan proceeds. Kennedy Funding also intends to obtain an updated appraisal of the Real Property after the escrow account is funded. In order to issue a loan commitment for $9,000,000.00, Kennedy Funding has stated that it requires that the appraisal indicate an "as is, quick sale" value for the real property of at least $15,000,000.00.

Debtor's Plan at 20–21.

The terms of the proposed loan from Kennedy are set forth in a July 8, 2003, loan commitment letter, admitted as Creditors' Exhibit 1 at the confirmation hearing. It sets forth three basic conditions that must be fulfilled prior to funding the loan: 1) the payment of a commitment fee; 2) a property valuation of at least fifteen million dollars on an "as is" quick sale

basis; and 3) the participation in the loan of investors.

First, the loan commitment requires the payment of a $270,000 commitment fee:

> The commitment and all of its terms and conditions will become effective only upon delivery to this office of a signed copy of this commitment, duly accepted by the Borrower, accompanied with the commitment fee in the amount of Two Hundred Seventy Thousand Dollars ($270,000.00) which is non-refundable and earned for among other things, the commitment to provide funds.

Exhibit 1 at 4 (lines 103–07). Upon payment of the fee, the fee was to be placed in an escrow account. Further, the fee was to be paid and the commitment letter was to be signed on or before July 31, 2003.[2] The July 8, 2003 commitment letter was never signed by Kennedy.

Second, the loan commitment provides for funding of the loan based on an "as is" quick sale value of $15 million.

> In accordance with the agreement by and between the parties, Borrower and Lender agree that the purpose of this Loan is to provide funds for improvements to the Collateral and that the basis of this Loan is the "as is" quick sale of the real estate Collateral and the quick sale value of the real estate Collateral "as completed" by KFI Loan proceeds. Quick sale is defined as a ninety (90) day to one hundred twenty (120) day sale to a cash buyer. The Borrower understands that KFI will inspect the

---

**2.** The loan commitment provides:

Notwithstanding the above requirement to pay Two Hundred Seventy Thousand Dollars ($270,000.00) at the signing of the commitment, ... KFI will accept payment of the Two Hundred Seventy Thousand Dollars ($270,000.00) in the following manner: Two Hundred Seventy Thousand Dollars ($270,000.00) to be placed in an escrow

account at Cole, Schotz, Meisel, Forman and Leonard, subject to an escrow agreement signed by both parties (Schedule "D"), at the time this commitment is signed, prior to our due diligence, which signing will be no later than July 31, 2003, time of the essence.

Exhibit 1 at 9 (lines 245–56).

Collateral and, in its sole discretion, determine both the "as is" and "as completed" valued of the Collateral based upon all plans, budgets, specifications, approvals, etc. provided by Borrower detailing the proposed improvements. Borrower acknowledges that KFI will not at any time lend or advance more than Sixty Percent (60%) of the quick sale of the real estate Collateral at that time . . . . .

If KFI's determination of the value of the property is disputed by the Borrower, Borrower may reject the Loan Offer and elect to engage the services of a third party appraiser. If Borrower makes this election, the Borrower and KFI shall mutually agree upon a third party MAI appraiser, with proper credentials, contracted by KFI, and any fees for said appraiser to be reimbursed by KFI by borrower prior to the appraisal being performed . . . . .

Creditors' Exhibit 1 at 4–5 (lines 111–43). The commitment letter provides that Kennedy will advance 60% of the "as is" quick sale value of the Property. Thus, for Debtor to obtain a nine million dollar loan, the "as is" quick sale valuation of the property would need to be at least fifteen million dollars. Under the terms of the commitment letter, the value is to be determined by Kennedy, in its sole discretion. If the Debtor/Borrower disagrees, then the parties will mutually agree on a third party appraiser. "As is" value is the value of the unimproved land as it currently exists. "Quick sale" is defined as a cash sale to a buyer with a short, ninety to one hundred twenty day, marketing period.

Third, the commitment letter provides that Kennedy will bring participants (investors) into the transaction. If Kennedy is unable to bring in such participants, then Kennedy can cancel its obligation to loan the funds:

KFI intends to bring participants into this transaction. If KFI is unable to do so, or if KFI does not perform its obligations under the terms of this commitment for whatever reason, KFI shall only be obligated to refund the commitment fee, less compensation for time and expenses . . . . .

Exhibit 1 at 6 (lines 165–68).

At the confirmation hearing, Debtor introduced a revised commitment letter from Kennedy, dated September 11, 2003 which was admitted as Debtor's Exhibit 34. The September 11 commitment letter, like the July 8 commitment letter, was unsigned. While the July 8 commitment letter provided that the commitment would expire and the loan closing would take place not later than September 19, 2003, Exhibit 1 (lines 49–50 & 159–60), the September 11 commitment letter provided that the commitment would expire and the closing would take place no later than October 24, 2003. Other than this extension of time, the September 11 commitment letter contains the same terms as the July 8 commitment letter. Most importantly, the September 11 commitment letter provides for the same conditions precedent described above: 1) payment of the $270,000 commitment fee; 2) a property valuation of at least fifteen million dollars on an "as is" quick sale basis; and 3) recruitment of participants in the transaction.

The Debtor's Plan provided that once the nine million dollar loan was obtained, the secured creditors and administrative claimants would be paid in full, the unsecured creditors would receive an initial distribution of $750,000 (with the balance of claims to be paid from the proceeds of the sale of lots), and equity shareholders would retain their interest.

The Official Committee of Unsecured Creditors (the "Committee") and Wayne County Treasurer filed objections to con-

firmation of the Debtor's Plan. In addition, on July 9, 2003, the Committee filed its own plan of reorganization (the "Committee's Plan"). The Committee's Plan provided that it would be financed by an "as is" immediate cash sale of the property to the Trust for Public Land for $4,800,000 [3] The Committee's Plan states:

> Article 7—Means for Implementation of Plan
>
> This Plan provides for the complete liquidation of the Debtor's Estate both real and personal property, and the Plan shall be funded by the proceeds of the liquidation of the Estate's assets. In particular, it is hereby proposed that TPL [Trust for Public Land] will pay $4.8 million to the Debtor's Estate to settle all Claims with respect to the Real Property, and in exchange for title to the Real Property, free and clear of all Liens, Claims, interest or other encumbrances, pursuant to § 1123(a)(5)(D) of the Bankruptcy Code (the "Sale"). The closing of the Sale shall occur on or before the eleventh (11th) Business Day following the Confirmation Date unless the parties mutually agree to extend such date.

Committee's Plan at 12. Under the terms of the Committee's Plan, the secured creditors would be paid in full; the unsecured creditors would receive a pro rata payment (after payment of the Administrative Claims and higher classes of claims); and the equity shareholders would not receive any distribution nor would they retain any property interest.

---

**3.** Debtor's Plan declares that "Debtor has explored the possibility of the outright sale of the Real Property, but was unable to generate interest in the Real Property for a sale at a price that would result in a substantial dividend to unsecured creditors." Debtor's Plan at 20. This statement is disingenuous in light

The Debtor objected to the Committee's Plan.[4] The hearing on confirmation of both the Debtor's and Committee's Plans was held on September 10, 2003 and continued on September 12, 2003.

## II

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(L) (confirmation of plans).

In order to confirm a plan of reorganization, the requirements set forth in 11 U.S.C. § 1129(a), with the exception of 1129(a)(8), must be satisfied. *In re Sis Corp.*, 120 B.R. 93, 95 (Bankr.N.D.Ohio 1990). The Court finds that Debtor's Plan fails to meet the requirements of 11 U.S.C. § 1129(a)(9) and 11 U.S.C. § 1129(a)(11).

### A. Feasibility

■ Debtor's Plan fails to meet the requirement that a plan must be feasible. Feasibility is a mandatory requirement for confirmation. *Id.* at 94. Section 1129(a)(11) of the Bankruptcy Code provides that a plan can be confirmed only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further organization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11).

---

of the Trust for Public Lands' offer to purchase the Property for $4.8 million.

**4.** Originally two secured creditors, Gibraltar–Trenton Development and Hennessey Engineers, Inc., also objected to the Committee's Plan, but they later withdrew their objections.

■ Section 1129(a)(11) prevents confirmation of visionary schemes which promise creditors more than the debtor can possibly attain after confirmation. *Travelers Ins. Co. v. Pikes Peak Water Co. (In re Pikes Peak Water Co.)*, 779 F.2d 1456, 1460 (10th Cir.1985). A plan that is submitted on a conditional basis is not considered feasible, and thus confirmation of such a plan must be denied. *Sis*, 120 B.R. at 94.

■ The plan does not need to guarantee success, but it must present reasonable assurance of success. *Kane v. Johns–Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988). To provide such reasonable assurance, a plan must provide a realistic and workable framework for reorganization. *Crestar Bank v. Walker (In re Walker)*, 165 B.R. 994, 1004 (E.D.Va.1994). *See also In re Howard*, 212 B.R. 864, 879–80 (Bankr.E.D.Tenn.1997) (like Chapter 11 plan, Chapter 12 plan must be realistic, not mere wishful thinking; debtors must be able to do what they are proposing). The plan cannot be based on "visionary promises;" it must be doable.

> Sincerity, honesty and willingness are not sufficient to make the plan feasible, and neither are visionary promises. The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts.

*In re Hoffman*, 52 B.R. 212, 215 (Bankr. D.N.D.1985).

In *Hoffman*, the debtor's plan proposed to pay creditors within two years from the sale of real property. However, there was no potential purchaser and the plan did not set forth the terms of the proposed sale. The court found that the plan was not feasible because the proposed sale of the real estate was not "sufficiently concrete to assure either consummation within the two-years or that even if sold within the two-year period the price obtained would be sufficient" to pay the secured creditor. *Id.*

Similarly, in *In re Walker*, 165 B.R. 994 (E.D.Va.1994), the court also found a plan based on funding through a speculative sale of real estate was not feasible. There, the district court reversed the bankruptcy court's confirmation of a plan because the plan was not feasible. The plan proposed to pay creditors from the sale of two parcels of real estate. However, the plan did not provide any time frame within which the properties would be sold, did not set forth the terms of the proposed sale, and did not set forth a plan for the liquidation of other properties if the proceeds from the sale of the two identified properties was insufficient to pay creditors. Based on these deficiencies, the court held that the proposed plan was not feasible. *Id.* at 1005.

Likewise, in *In re Thurmon*, 87 B.R. 190 (Bankr.M.D.Fla.1988), the court found that a plan conditioned on a sale of property which in turn was conditioned on financing was not feasible. In *Thurmon*, the plan proposed that funding would be obtained through a lease purchase agreement. The lease purchase agreement provided that a buyer would lease property from the debtor and would then purchase 147 acres from the debtor. The closing of the land sale was conditioned on the buyer's ability to obtain financing on favorable terms. The buyer had not yet applied for the financing but testified that he would do so within 30 days. The court found that the plan was not feasible because it was not reasonably likely that the money to fund the plan would come from the buyer.

■ While Debtor in this case is sincere, honest, and willing, the Debtor's Plan of Reorganization is not realistic, as it does not provide a reasonable assurance

of success. The Plan is based on "wishful thinking" and "visionary promises." As a practical matter, the Debtor's Plan is not sufficiently concrete as to be feasible because it is contingent on exit financing from Kennedy and there is no reasonable assurance that the Kennedy loan will ever close or that the Property will be appraised at a value high enough to provide a $9 million loan. Like in *Hoffman, Walker,* and *Thurmon,* it is not reasonably likely that Debtor's Plan will be funded. The conditions precedent to Kennedy's funding of the loan were not satisfied as of the date of the confirmation hearing. Further, the evidence did not show that the satisfaction of such conditions was reasonably likely in the foreseeable future.

The $270,000.00 loan commitment fee was never put into an escrow account or paid to Kennedy Funding. At the hearing, Debtor argued that the Court prevented it from paying the commitment fee. The Debtor previously attempted to pay the fee by obtaining Court approval of a loan from shareholders, which loan was to be repaid as an administrative expense. On May 23, 2003, the Debtor brought a motion for additional unsecured debt under 11 U.S.C. § 364(b), which authorizes the payment of unsecured debt as a first priority administrative expense.[5] The motion sought court approval to borrow $240,000 from Debtor's shareholders to pay a commitment fee in that amount to Kennedy Funding, Inc. The Debtor proposed that repayment of the shareholder loan would be due on the Effective Date of the Second Amended Plan, and would have administrative priority under 11 U.S.C. § 503(b)(1) and 507(a)(1).

On July 3, 2003, the Court denied the Debtor's motion under 11 U.S.C. § 364(a) because the Debtor's proposed shareholder loan for the purpose of paying the commitment fee was not a post-petition ordinary-course-of-business debt. Further, the Court denied Debtor's request to incur the proposed loan as unsecured debt under 364(b), which required Court approval, because the loan was not a proper administrative expense as it did not directly and substantially benefit the estate. Debtor did not meet its burden of showing benefit to the estate, because the Kennedy loan was contingent. There was no guarantee that Kennedy would ever fund the loan. Also, even if Kennedy did fund the loan, the Debtor's Plan might not be confirmed. Thus, there was no showing that payment of the loan commitment fee would benefit the estate. Further, Debtor did not meet its burden of showing that the funding was a loan that could be classified as an administrative expense because, under the totality of the circumstances, the funding appeared to constitute capital contributions, not a loan. In sum, the Court denied Debtor's request to have the commitment fee classified as an administrative expense which is entitled to first priority repayment. However, this ruling did not "prevent" Debtor from paying the commitment fee. Debtor could have paid the fee via capital contributions or loans that would not be entitled to repayment ahead of other creditors.

Since April 25, 2003, the date that Debtor filed its Second Amended Plan, Debtor knew that its Plan depended upon exit financing from Kennedy that required a

---

**5.** The May 23, 2003, motion was Debtor's third motion to incur additional debt to be treated as a priority administrative expense. Debtor sought authorization for post-petition financing to be treated as an administrative expense pursuant to 11 U.S.C. § 364(b). On December 18, 2002, the Court authorized $75,000 in such post petition financing. Debtor then sought approval for an additional $150,000 in post petition financing, and on May 5, 2003, the Court authorized the additional amount.

large commitment fee. Further, as of July 3, 2003, Debtor knew that it could not fund the commitment fee with shareholder loans that would be repaid as priority administrative expenses since the Court had denied Debtor's motion for additional unsecured debt. Yet it was not until the confirmation hearing that Debtor began to obtain funds for the commitment fee. Debtor's last minute attempts were inadequate. At the hearing, Debtor attempted to present evidence of payment of the $270,000 commitment fee by presenting copies of the following checks, made payable to the "Made in Detroit Defense Fund" and held by the attorney for some of Debtor's shareholders, Nanci Irene Rowe:

| | |
|---|---|
| Official Check from Kidney Replacement Services, dated 9–12–03 | $170,000 |
| Check from William McAllister, dated 9–11–03 | 10,000 |
| Check from James B. Smith, dated 9–9–03 | 50,000 |
| Check from William McAllister, dated 9–19–03 | 40,000 |

Debtor's Exhibits 35 & 36. However, the $40,000 check from William McAllister was post dated September 19, 2003, and the remaining checks totaled only $230,000. Moreover, there was no evidence that the checks had been deposited into an escrow account or that they had been paid to Kennedy. Since Debtor did not pay the commitment fee, Kennedy did not sign the loan commitment letter and did not commence its due diligence.

Even if Debtor had paid the commitment fee, there still were substantial obstacles to closing on the proposed Kennedy loan. First and foremost, in order for Kennedy to fund the required nine million dollar loan, it would need to value the Property on an "as is" quick sale basis at $15 million. The evidence did not provide any reasonable assurance that the Property would be valued at this amount; in fact, the evidence showed that the Property, if

sold "as is", was only worth approximately $4.2 million.

The best evidence of the value of the property, what a reasonable buyer would pay a reasonable seller for the property, is the Trust for Public Land's offer to purchase the Property "as is" for $4.8 million. Additional evidence that the "as is" value of the Property is well below the $15 million value needed to obtain the Kennedy financing was provided by a current appraisal prepared by Integra Realty Resources. Creditors' Exhibit 3.

The Integra appraisal report, dated on September 5, 2003, indicates that the "as is" market value of the Property, if marketed from nine to twelve months, was $5,260,000. The report also stated the "disposition value" of the Property, if only marketed for three to six months, was $4,210,000. The "as is" quick sale value as defined in the Kennedy commitment letter was based on a marketing period of "90 to 120 days," i.e. three to six months. Thus, for Kennedy to fund the $9 million loan proposed in Debtor's Plan, the "disposition value" of the Property would have to be at least $15 million. The appraiser who prepared the Integra report, Kenneth Blondell, testified at the confirmation hearing. Blondell is a certified MAI appraiser, and he was qualified as an expert. The Integra report and Blondell's testimony provided a credible expert opinion that the disposition value of the Property is only $4.2 million.

Debtor called another appraiser, William Walsh, as a witness. Mr. Walsh had not prepared his own appraisal but had reviewed the Integra appraisal. Walsh testified that the Integra appraisal was deficient because it was not "self contained"; it did not have various supporting documents attached and certain presumptions made were not sufficiently spelled out. Also, Walsh criticized some of the compa-

rable sales set forth in the Integra report. For example, Walsh opined that the property located on Belleville Lake was not comparable to this Property located on the Detroit River because the Belleville Lake property was not on a waterway connected to the Great Lakes. In addition, Walsh determined that the Integra appraisal obtained the "as is" market value (if marketed for nine to twelve months) and then ascertained the disposition "quick sale" value by discounting the market value by 20%. He testified that the Integra report should explain why it used 20% for the discount.

Walsh, who was not an MAI certified appraiser, did not prepare his own appraisal of the Property. He never viewed the Property, and he did not obtain his own comparables. Thus, he did not provide an opinion as to the value of the Property, and his testimony provided limited assistance to the Court. While the Integra report may not be entirely "self contained," the Court finds that it contains sufficient information to support its valuation of the Property. Further, it is difficult to find property that is exactly comparable to this Property. Moreover, the differences pointed out by Walsh were either not significant or were balanced by other factors. For example, Belleville Lake is not a Great Lakes connected waterway and this arguably reduces the value of the property; however, docks could be built on the Belleville Lake lots and

this arguably increases the value of the property. Docks could not be built on the Detroit River lots due to a conservation easement which prohibits such construction. Further, the Court finds that the 20% discount used by Mr. Blondell to determine the disposition "quick sale" value of the property was reasonable. Mr. Blondell testified that the market vale of property is less if the property has to be sold quickly. He also testified that his discount was based on his review of real estate marketing data and trade publications. Also, there was no evidence whatsoever to refute the disposition "quick sale" value set forth in the Integra appraisal.

The Debtor's principal, William Merriweather, testified that in his opinion, the Property had a potential value of $15,000,000.00. Merriweather based his opinion in part, on prior appraisals of the Property. Portions of some of these appraisals were admitted at the confirmation hearing as Exhibits 4, 5, 6, and 7, for the purpose of showing that other appraisals of the Property had been conducted. However, the contents of the appraisals were hearsay and must be disregarded by the Court.[6]

Merriweather's opinion also was based on his belief that the Property had increased in value because Debtor had obtained preliminary site plan approval from the City of Gibraltar.[7] However, Debtor

---

**6.** The values found in these appraisals, and the presumptions upon which they were based, ranged dramatically. One appraisal, dated March 2002, valued the Property at $3.37 million on an "as is" basis. In contrast, another appraisal, dated November 1998, provided a $18 million prospective market value of the Property on an "as completed" basis, including a golf course, marina, equestrian center, retail and entertainment facilities.

Also, the Debtor's Plan states that it sought a loan from Kennedy in 2001 and that at that time Kennedy obtained a quick sale appraisal of the Property in the amount of eleven million dollars. Debtor's Plan at 20. No evidence in support of this statement was submitted to the Court. Thus, the statement must be disregarded in determining value for the purpose of evaluating Debtor's Plan.

**7.** With regard to site plan approval, Debtor's Plan states:

did not have final site plan approval from the City of Gibraltar.

While site plan approval may enhance the value of a piece of real estate, Blondell testified that he took into account that the Debtor had preliminary site plan approval in conducting his appraisal. Thus, the Integra valuation includes any increase in value that preliminary site plan approval might provide.

Debtor also argued that the value of the property was at least $15 million because Debtor had entered into a term sheet with a well-known and successful builder who would purchase lots to build homes for resale. Debtor's Plan at 21–2; Creditors' Exhibit 2. Thus, Debtor reasoned, the Property had an increased value because it would generate income. However, the builder term sheet was not binding. It provided, "No rights or obligations shall apply with respect to the foregoing until a formal purchase agreement is executed and delivered between the parties identified herein." Exhibit 2 at 6. There was no evidence that Debtor and the builder had entered into such a formal binding contract. The term sheet also provided that, within the 120 day due diligence period, the builder could decide not to proceed to purchase "for any reason in his sole discretion." *Id.* at 1. Thus, the term sheet did not add value to the Property.

The Court accords little weight to Merriweather's opinion that the Property's "as is" quick sale value is $15 million. He is not an appraiser and has never developed commercial real estate. His opinion regarding the value of the property was a lay opinion. In addition, Merriweather's testimony is, understandably, biased. He is the Chairman of the Board and the Chief Executive Officer of Debtor, he has an employment contract with the Debtor, he has made loans to the Debtor, and he has guaranteed other loans to the Debtor. In contrast, the expert opinion of the appraiser, Integra, must be accorded great weight. The Integra appraisal was an independent appraisal and there was no showing of bias.

In summary, the Debtor failed to show at confirmation that it had exit financing to fund its plan. The proposed financing had so many contingencies that Debtor's Plan was conditional at best. Thus, the Debtor's Plan is not feasible under 1129(a)(11), and the Court must deny confirmation of Debtor's Plan.

### B. Wayne County's Objection to Debtor's Plan

█ The Wayne County Treasurer also filed objections to confirmation of the Debtor's Plan pursuant to 11 U.S.C. § 1129(a)(9). 11 U.S.C. § 1129(a)(9) states, in relevant part,

(a) The court shall confirm a plan only if all of the following requirements are met:

\* \* \* \* \* \*

The Debtor obtained preliminary site plan approval for the present plan for Gibraltar Bay in August 2002, which represented a significant step in the completion of Gibraltar Bay. In order to obtain final site plan approval from the City of Gibraltar, the Debtor must complete its engineering drawings, which are already 50 to 60 percent complete, and comply with § 28–423(b)(1)(a) of the Gibraltar Code. The Debtor must submit its application for final site plan approval by August 23, 2003. A copy of § 28–423(b) of the Gibraltar Code is attached as Exhibit C. The Debtor in obtaining preliminary site plan approval has already complied with the majority of the City of Gibraltar's requirements for final site plan approval. Approval from the City of Trenton, Wayne County and the State of Michigan will also be required, but most requirements for those approvals overlap with the requirements of the City of Gibraltar.

Debtor's Plan at 18.

(9) Except to the extent that a holder of a particular claim has agreed to a different treatment of such claim, the plan provides that—

(A) with respect to a claim of a kind specified in section 507(a)(1) or 507(a)(2) of this title, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

\*     \*     \*     \*     \*     \*

(C) with respect to a claim of a kind specified in section 507(a)(8) of this title, the holder of such claim will receive on account of such claim deferred cash payments, over a period not exceeding six years after the date of assessment of such claim, of a value, as of the effective date of the plan, equal to the allowed amount of such claims.

The Treasurer is the tax collecting agent for the Wayne County and for the cities within the County, including the Gibraltar and Trenton. The outstanding property taxes owed by the Debtor to Wayne County, the City of Gibraltar, and the City of Trenton as of August 31, 2003 total $396,816.25. In addition, 2003 taxes are accruing. Taxes that became due in July of 2003 must be paid by December of 2003, and taxes that become due in December of 2003 must be paid by March of 2004.

The Wayne County Treasurer objected to the Debtor's Plan because it failed to provide a date certain on which the funding would be in place and the taxes would be paid. To render a plan confirmable, it must provide for full payment, including interest, to the taxing authorities. 11 U.S.C. §§ 506(b), 1124, & 1129(a)(9). Debtor's Plan provided no date certain for payment, as the Plan was contingent on financing by Kennedy and such financing in turn was contingent upon multiple conditions precedent. Therefore, the Court finds that, because Debtor's Plan fails to meet the mandatory requirement set forth in 11 U.S.C. § 1129(a)(9), it may not be confirmed.

### C. Absolute Priority Rule

The Committee also argues that the Debtor's Plan cannot be confirmed because it violates the absolute priority rule. Because the Court holds that the Debtor's Plan is not feasible under 11 U.S.C. § 1129(a)(11) and 11 U.S.C. § 1129(a)(9), the Court does not need to address 11 U.S.C. § 1129(b).

■ Although the Court does not need to reach the issue, it is worth noting that the Debtor's Plan cannot be confirmed under the "cramdown" provisions of 11 U.S.C. § 1129(b). Section 1129(b) provides that a plan must be "fair and equitable" with respect to each class of impaired claims. Thus, the shareholders of a debtor corporation may not use bankruptcy reorganization to impair the interests of unsecured creditors while preserving their own equity. *Louisville Trust Co. v. Louisville, New Albany, and Chicago Rwy.*, 174 U.S. 674, 689, 19 S.Ct. 827, 43 L.Ed. 1130 (1899). This has become known as the "absolute priority rule," and a modified version of the rule is now codified at 11 U.S.C. § 1129(b)(2)(B)(ii), which provides:

> With respect to a class of unsecured claims—
>
> (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

*Bank of America Nat'l Trust and Sav. Ass'n v. 203 N. LaSalle Street Partnership*, 526 U.S. 434, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999).

The Debtor's Plan provides for the pro rata distribution of $750,000 to be paid to unsecured creditors. The Plan payment also proposes to pay the balance of the unsecured debt, without interest, within two years. The funds to pay the unsecured debt are to be generated by the sale of lots. Further, the Plan provides that the equity interests of Debtor's shareholders (Class 11) are to be "retained by such claimants at the same level of priority and with the same percentage of ownership in the Reorganized Debtor as existed in the Debtor prior to the filing of the Petition." Debtor's Plan at 10. Because the Plan fails to provide for the full payment with interest to the unsecured creditors while at the same time preserving in full the shareholders' equity, the Plan violates the absolute priority rule. Even if the Debtor modified its Plan to provide for payment of interest on the unsecured claims, the speculative nature of the payment of the unsecured claims, while the shareholders retain their equity, is a violation of the absolute priority rule. Accordingly, the Court finds that, for this reason, Debtor's Plan cannot be confirmed.

### D. Committee's Plan

The Debtor's Plan, standing on its own, does not comply with the feasibility requirements of 11 U.S.C. § 1129(a)(11). The conditional nature of the Debtor's Plan was particularly obvious in this case because of the existence of a competing plan with immediate, unconditional financing. The Committee's Plan provided that it would be financed by an "as is" immediate cash sale of the property to the Trust for Public Land for $4,800,000. Al Raymond, a witness representing the Trust for Public Land, testified that the Trust for Public Land could close on the sale of the property immediately. Under the terms of the Committee's Plan, the secured creditors and administrative claimants will be paid in full; the unsecured creditors would receive a pro rata payment; and the equity shareholders would not receive any distribution nor would they retain any property interest. The Committee estimated that, under its Plan, the unsecured creditors would receive an immediate payment of approximately $600,000 to be distributed pro rata.

Debtor argued that the Committee's Plan could not be confirmed because it failed to meet the best interest of the creditors test. Under 11 U.S.C. § 1129(a)(7), a plan must either be accepted by each holder of an impaired claim or interest, or each such holder must "receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date." Debtor contends that the unsecured creditors, whose claims are impaired under the Committee's Plan, would receive more in a chapter 7 liquidation than they would receive under the Committee's Plan. Debtor argues that this is true because the Property has a liquidation value in excess of the $4.8 million sales price to the Trust for Public Lands. The Debtor produced no evidence to support its argument regarding the liquidation value of the property.

Debtor's argument fails because the liquidation value of the Property is less than the $4.8 million dollar sales price. Al Raymond testified that, if the Property were sold in the context of a Chapter 7 liquidation, the Trust would bid $1 more than the amount of the secured claims (the secured claims total approximately $3,700,000) rather than $4,800,000. Further, the Integra appraisal set forth a liquidation value, termed a "disposition value" in the report, of $4.21 million. Thus,

because the Committee's Plan provides for a distribution to the unsecured creditors that would be more than they would receive under a Chapter 7 liquidation, the Committee's Plan meets the best interest of the creditors test.

The Court must also take into account that time is of the essence. If the Court were to confirm Debtor's Plan, delay would result. The Debtor's Plan is contingent on numerous conditions that may or may not take place at some unspecified time in the future. If this case were converted to a Chapter 7 proceeding, delay also would likely result. The Trustee would have to evaluate and market the Property. In the meantime, the Debtor is not generating any income, and interest on Gibraltar–Trenton's secured loan is accruing at a rate of approximately $20,000 per month. Also, property taxes of approximately $200,000 are accruing annually. The increased expenses caused by such delay would result in a reduction in the amount that may be recovered by unsecured creditors.

### III

### *CONCLUSION*

Based on a detailed review of the pleadings, including Debtor's Plan and the Committee's Plan, and the evidence presented at the confirmation hearing, the Court denies confirmation of the Debtor's Plan and confirms the Committee's Plan. The Debtor's Plan does not comply with 11 U.S.C. § 1129(a)(9) or 11 U.S.C. § 1129(a)(11). In addition, even if the Debtor's plan were confirmable under 11 U.S.C. § 1129(a), the plan cannot be confirmed under 11 U.S.C. § 1129(b)(2)(B)(ii) because it violates the absolute priority rule.

Being fully advised in the premises and for the reasons stated above, the Court hereby DENIES confirmation of Debtor's Plan. The Court entered the Order confirming the Committee's Plan on September 15, 2003.