ELECTRONIC CITATION:  2008 FED App. 0012P (6th Cir.)
File Name:  08b0012p.06

# BANKRUPTCY APPELLATE PANEL OF THE SIXTH CIRCUIT

In re: BRICE ROAD DEVELOPMENTS, L.L.C.,   )
  )
                    Debtor.   )
  )
_____ )
  )
GENERAL ELECTRIC CREDIT EQUITIES, INC., )
  )
             Appellant,   )
  )
        v.   )    No. 06-8093
  )
BRICE ROAD DEVELOPMENTS, L.L.C. and   )
SIR KENSINGTON ASSOCIATES, LLC,   )
  )
           Appellees.   )
_____ )

Appeal from the United States Bankruptcy Court
for the Southern District of Ohio, Eastern Division.
Case No. 05-66007.

Argued: May 13, 2008

Decided and Filed:  August 14, 2008

Before: GREGG, PARSONS, and SCOTT, Bankruptcy Appellate Panel Judges.

_____

## COUNSEL

**ARGUED:**  G. Christopher Meyer, SQUIRE SANDERS & DEMPSEY LLP, Cleveland, Ohio, for Appellant.  Yvette A. Cox, BAILEY CAVALIERI LLC, Columbus, Ohio, for Appellees.  **ON BRIEF:** G. Christopher Meyer, SQUIRE SANDERS & DEMPSEY LLP, Cleveland, Ohio, William M. Mattes, Donald W. Mallory, DINSMORE & SHOHL LLP, Columbus, Ohio, for Appellant. Yvette A. Cox, BAILEY CAVALIERI LLC, Columbus, Ohio, Richard K. Stovall, ALLEN KUEHNLE STOVALL & NEUMAN LLP, Columbus, Ohio, for Appellees.

---

**OPINION**

---

MARCIA PHILLIPS PARSONS, Chief Bankruptcy Appellate Panel Judge. General Electric Credit Equities, Inc. ("GE") appeals an order of the bankruptcy court confirming the chapter 11 reorganization plan of Brice Road Developments, L.L.C. ("Debtor"). GE objected to confirmation of the plan on the basis that the plan was not feasible as required by 11 U.S.C. § 1129(a)(11) and the plan was not fair and equitable as required by 11 U.S.C. § 1129(b)(2) because it provided for an improper interest rate on GE's secured claim, undervalued GE's collateral, and failed to accord GE its rights as an electing secured creditor under 11 U.S.C. § 1111(b)(2).[1] For the reasons that follow, we affirm the bankruptcy court in all respects, with the exception of the conclusion that the plan accords GE the full rights of an electing § 1111(b) secured creditor. On this issue, this case will be remanded for further action by the bankruptcy court.

## I. ISSUES ON APPEAL

The issues presented by this appeal are: (1) whether the bankruptcy court erred in assigning a 6% present value rate to GE's claim; (2) whether the bankruptcy court erred in its valuation of GE's collateral; (3) whether the plan is feasible as contemplated by § 1129(a)(11); and (4) whether the plan provides GE its proper rights as an electing secured creditor under § 1111(b)(2).

## II. JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction to decide this appeal. The United States District Court for the Southern District of Ohio has authorized appeals to the Panel, and neither party has timely elected to have this appeal heard by the district court. 28 U.S.C. §§ 158(b)(6), (c)(1). A final order of the bankruptcy court may be appealed as of right pursuant to 28 U.S.C. § 158(a)(1). For purposes of appeal, a final order "ends the litigation on the merits and leaves nothing for the court to do but execute the

---

[1] The Debtor's bankruptcy case was filed before October 17, 2005. All references to the Bankruptcy Code, 11 U.S.C. § 101-1330, herein "§ ___," are to the pre-BAPCPA version. *See* Bankruptcy Abuse and Consumer Protection Act of 2005, Pub. Law No. 109-8, § 1501(b)(1), 119 Stat. 23, 216 (stating that, unless otherwise provided, the BAPCPA amendments do not apply to cases pending before the effective date of BAPCPA).

judgment." *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 798, 109 S. Ct. 1494, 1497 (1989) (citations omitted). The bankruptcy court's order overruling GE's objection and confirming the Debtor's reorganization plan is a final order. *G.E. Cattle Co. v. United Producers, Inc. (In re United Producers, Inc.)*, 353 B.R. 507, 508 (B.A.P. 6th Cir. 2006), *aff'd*, 526 F.3d 942 (6th Cir. 2008).

The bankruptcy court's conclusions of law are reviewed de novo. *Riverview Trenton R.R. Co. v. DSC, Ltd. (In re DSC, Ltd.)*, 486 F.3d 940, 944 (6th Cir. 2007). "Under a *de novo* standard of review, the reviewing court decides an issue independently of, and without deference to, the trial court's determination." *Menninger v. Accredited Home Lenders (In re Morgeson)*, 371 B.R. 798, 800 (B.A.P. 6th Cir. 2007). Whether a chapter 11 reorganization plan correctly applies an undersecured creditor's election pursuant to § 1111(b)(2) involves interpretation and application of the Bankruptcy Code which is a question of law reviewed de novo. *First Fed. Bank of Cal. v. Weinstein (In re Weinstein)*, 227 B.R. 284, 289 (B.A.P. 9th Cir. 1998); *see also Cluxton v. Fifth Third Bank (In re Cluxton)*, 327 B.R. 612, 613 (B.A.P. 6th Cir. 2005) ("The determination whether a plan provision violates the Bankruptcy Code is a legal conclusion reviewed de novo.")

The court's findings of fact are reviewed under the clearly erroneous standard. *In re DSC, Ltd.*, 486 F.3d at 944. "A finding of fact is clearly erroneous 'when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Id.* (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S. Ct. 1504 (1985)).

## III.   FACTS

The Debtor is the owner of a partially completed 264 unit apartment complex known as Kensington Commons ("Kensington Property"). Construction of the complex began in 2001. The Debtor began renting units in 2003.

In January 2001, Armstrong Mortgage Company ("Armstrong Mortgage") provided the Debtor financing for the purchase of real estate and construction of the Kensington Property through a U.S. Department of Housing and Urban Development ("HUD") program whereby HUD guaranteed payment. The Debtor executed and delivered to Armstrong Mortgage a non-recourse mortgage note

("Note") in the original principal amount of $15,444,400, and a mortgage deed ("Mortgage") granting liens on substantially all of the Debtor's assets, including the Kensington Property. The Note provided for interest to accrue at the rate of 7.75%. Payments of interest were to begin on February 2, 2001. Monthly payments of principal and interest in the amount of $104,500 were to begin on March 1, 2003. Prepayments prior to March 1, 2013, were prohibited. The Mortgage granted the mortgagee the right to "the estate, title and interest of said Mortgagor either in law or equity in and to [the Kensington Property]." (Appellees' App. at 291.) The Debtor exhausted its commitment for the construction loan, and 24 units remain unfinished.

The Debtor defaulted on the payment due in March 2004, and made no further payments. Armstrong Mortgage invoked its HUD guarantee and assigned the Note and Mortgage to HUD. GE subsequently purchased the Note, Mortgage and related loan documents as one loan in a bundle of six loans at a HUD auction sale. GE allocated approximately $10.7 million of the total purchase price to the Kensington Property.

The Debtor failed to commence making payments as required by the Note. GE filed a state court foreclosure action on July 7, 2005. In response, on September 2, 2005, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On November 3, 2005, GE filed a proof of secured claim in the amount of $16,453,965.74 ("Claim"). On January 27, 2006, GE filed its election under § 1111(b)(2) to have its Claim treated as fully secured. GE then filed a motion requesting valuation of its collateral. Following a lengthy hearing on the motion, the bankruptcy court concluded in an order entered June 22, 2006, that the "as is" value of the Kensington Property was $10.5 million. After deduction of outstanding real estate taxes, GE's interest in the value of the Kensington Property was $10,258,000. (Appellee's App. at 166 n.3).[2]

The Debtor and SIR Kensington Associates, LLC (SIR Kensington)[3] filed a first amended joint plan of reorganization on January 27, 2006, along with an amended disclosure statement that was approved by the bankruptcy court on March 20, 2006. Additional modifications to the first

_____

[2] GE did not appeal the valuation order at that time.

[3] SIR Kensington is a single purpose entity owned by Sound View Real Estate Partners, L.L.C., a real estate investment firm. SIR Kensington provided postpetition financing to the Debtor to support its cash flow needs.

amended joint plan of reorganization were filed on June 18 and 20, 2006 (collectively the "Plan"), by the Debtor and SIR Kensington ("Plan Proponents").

The Plan is premised first on a $2.5 million cash infusion of equity and subordinated debt by SIR Kensington, which will be partially allocated to fund the Plan and to provide capital. Implementation of the Plan will be augmented by the Debtor's future income, which will be enhanced by completion and rental of the 24 unfinished units. In satisfaction of the Debtor's liability to SIR Kensington for money previously loaned, SIR Kensington will be issued all the member interest in the Debtor.

The Plan classifies creditors and equity security holders into eight classes. GE is the sole creditor in Class 2. Pursuant to the Plan, GE has an allowed secured claim that will be paid at the rate of 6% per annum in equal monthly installments based on an amortization period of 40 years, with a balloon payment of unpaid interest and principal on February 1, 2043. GE retains its lien to the extent of the allowed amount of the Claim. All other terms and conditions contained in the Note and Mortgage remain in full force and effect. The plain language of the Plan does not provide GE a restructured Note.

All classes except for GE accepted the Plan. GE filed an objection to confirmation on June 5, 2006. A confirmation hearing was held on June 19 and 20, 2006, at which the Debtor and SIR Kensington requested that the bankruptcy court confirm the Plan pursuant to the "cramdown" provisions of § 1129(b). The bankruptcy court issued a memorandum opinion on September 29, 2006, overruling GE's objection. An order confirming the Plan was issued on October 24, 2006. GE timely filed this appeal.

## IV.   DISCUSSION

### A. *The Bankruptcy Court Did Not Err in Finding a 6% Interest Rate.*

After hearing extensive testimony and considering the Sixth Circuit Court of Appeals' opinion in *Bank of Montreal v. Official Committee of Unsecured Creditors (In re American Homepatient, Inc.)*, 420 F.3d 559 (6th Cir. 2005), the bankruptcy court found that the Plan's "proposed interest rate of 6% is within the range of the rates in an efficient market for a long-term loan secured by a first mortgage on multi-family real estate with a long useful life, of the size of the

Debtor's loan held by GE Credit." (Appellee's App. at 169-70.) GE argues that, at a minimum, a market rate loan must be established based upon terms similar to those proposed by the Plan Proponents, including the particular circumstances of the Debtor as to the risk factor. GE further argues that the testimony of its expert, Jeffery Morris, CEO of Morris, Smith & Fay, supports an interest rate of 8.0182%.

Citing to *Household Automotive Finance Corp. v. Burden (In re Kidd)*, 315 F.3d 671 (6th Cir. 2003), GE asserts that we must review the bankruptcy court's decision on the market rate of interest de novo. We reject this argument. This Panel is not a fact finder. In *Kidd*, the Sixth Circuit held that the selection of the appropriate interest rate involved a legal determination that required de novo review because the court was establishing for the circuit the *methodology* under which the cramdown rate in a chapter 13 case is to be determined. *Id.* at 675. As both parties acknowledge, the Sixth Circuit has already established the methodology by which the cramdown rate in a chapter 11 case is to be calculated. *In re Am. Homepatient, Inc.*, 420 F.3d at 568. Because the methodology has already been established, the bankruptcy court's determination of the appropriate interest rate is reviewed for clear error. *Fin. Sec. Assurance, Inc. v. T-H New Orleans Ltd. P'Ship (In re T-H New Orleans P'ship)*, 116 F.3d 790, 800 (5th Cir. 1997); *see also In re Grand Traverse Dev. Co. Ltd. P'ship, Inc.*, 151 B.R. 792, 797 (W.D. Mich. 1993).

The cramdown provisions in § 1129(b) do not specify how a bankruptcy court should calculate the appropriate cramdown interest rate. However, in this circuit, in a chapter 11 case where an "efficient market" exists, the market rate should be applied, and where no "efficient market" exists, the formula approach endorsed by the Supreme Court in *Till v. SCS Credit Corp.*, 541 U.S. 465, 124 S. Ct. 1951 (2004), should be employed. *In re Am. Homepatient, Inc.*, 420 F.3d at 568. It is GE's burden to demonstrate that a higher rate than that proposed by the Debtor is appropriate. *See Till*, 541 U.S. at 484.

As the bankruptcy court noted, the term "efficient market" was not defined in *Till* or *American Homepatient* and neither case offers "much guidance in determining how to ascertain the efficient market rate, nor . . . suggest[s] whether the rate may vary based on loan criteria." (Appellee's App. at 166.) Concluding that the typical criteria for establishing an interest rate in the commercial lending market is in effect the "coerced loan" approach that was rejected by the Supreme

Court in *Till*, and recognizing that both *Till* and *American Homepatient* "embrace the use of generally applicable interest rates rather than loan-specific interest rates," the bankruptcy court set forth the following criteria for evaluating a proposed efficient market rate:

> the priority of the lien securing the loan; whether there exists an open, well-developed market for loans of the kind between the debtor and secured creditor; the type of collateral involved; the quality, age, and life expectancy of the collateral; short or long term nature of the proposed term of the loan; and the amount financed.

(Appellee's App. at 167.)

The bankruptcy court heard the testimony of two witnesses on behalf of the Plan Proponents: Brad Armstrong, a principal of Armstrong Mortgage, the original lender to the Debtor, who has extensive experience in HUD lending, and Nicholas Newman, a witness with significant experience in the field of real estate finance. Armstrong testified regarding various options for first mortgage financing with respect to multi-family housing, including options offered through HUD programs. He opined that the prevailing interest rate for such loans range between 5.5% and 6.25%. Newman testified that, based upon the interest rate on 10-year Treasury bonds plus a spread of 1%, the appropriate interest rate is 6.01%.

GE presented the testimony of Jeffrey Morris, president of a mortgage brokerage firm. Morris testified that his only experience with HUD lending was in the "early 90's" for approximately two years. According to Morris, the Debtor would not be able to obtain the same terms as the proposed note to GE. The only market available, according to Morris, would be a complete refinancing under tiered financing. This tiered financing would have a blended interest rate of 8%. Morris further testified that under an existing approved loan application pertaining to a comparable, but significantly older, property in the same area, the interest rate would be the 10-year Treasury rate of 5.15% on the date of the hearing, plus a spread of 1.11%, for a total interest rate of 6.26%. The tiered financing suggested by Morris was rejected by the bankruptcy court based on the Sixth Circuit's rejection of similar testimony in *American Homepatient*, wherein the court stated:

> The lenders' argument, on the other hand, is centered on the composite interest rate that a new loan (including "mezzanine" debt and equity) would command in the market, not what their loan to American (which was all senior debt) would require. But as the bankruptcy court properly noted:
>
>> 'The Lenders' argument that the debtor could not obtain a "new loan" in the market place so highly leveraged might be so, but in actuality no new loan is being made here at all. Instead, the court

> is sanctioning the workout between the debtor and the Lenders. New
> funds are not being advanced without the consent of the claimants.'

> Indeed, the only type of debt contemplated by American's reorganization plan was
> senior secured debt. The inclusion of other types of financing-mezzanine debt and
> equity-is a pure hypothetical suggested by the lenders.

*In re Am. Homepatient, Inc.*, 420 F.3d at 568-69 (quoting *In re Am. Homepatient, Inc.,* 298 B.R. 152, 184 (Bankr. M.D. Tenn. 2003)).

Based on the testimony and evidence presented at the confirmation hearing, GE did not satisfy its burden to demonstrate that a higher rate than that proposed by the Plan Proponents is required. The bankruptcy court's finding that the proposed interest rate of 6% was appropriate is not clearly erroneous.

**B. *The Bankruptcy Court Did Not Err in its Valuation of the Property*.**

Following a two-day valuation hearing, the bankruptcy court valued the Kensington Property at $10.5 million. GE asserts that the bankruptcy court erred in the valuation because of its "refusal to give sufficient weight to the most relevant possible evidence, a recent arms-length offer [of $13.1 million] to purchase the Kensington Property." (Appellant's Br. at 36.) GE also argues that the bankruptcy court's valuation of the property was inconsistent with a $13.5 million valuation by the Franklin County Auditor, and the HUD approved value of the project of $17.5 million. Additionally, at the valuation hearing the Debtor claimed the property had a value of $13.968 million.[4]

---

[4] The Plan Proponents argue that GE waived its objection to the valuation of the property by failing to raise it at the confirmation hearing or immediately appealing the valuation order. We reject this argument. The bankruptcy court's order determining the value of the property is a final order that may have been appealed immediately. *Chase Manhattan Mortgage Corp. v. Rodriguez (In re Rodriguez)*, 272 B.R. 54, 58 (D. Conn. 2002); *see also Lindsey v. O'Brien, Tanski, Tanzer & Young Health Care Providers of Conn. (In re Dow Corning Corp.)*, 86 F.3d 482, 488 (6th Cir. 1996) (an order that finally disposes of discrete disputes within a larger case may be appealed immediately). The right to immediately appeal an order under § 506(a) does not preclude appeal of that order from plan confirmation. *In re Rodriguez*, 272 B.R. at 58 (renewal of a creditor's objection to valuation at the confirmation hearing is not necessary to preserve the right to appeal the valuation so long as the objection was clearly made and fully litigated at some point in the litigation). Moreover, the bankruptcy court incorporated many of its findings at the valuation hearing into its memorandum opinion from which GE now appeals.

Valuation of collateral is a question of fact reviewed under the clearly erroneous standard. *In re Am. Homepatient, Inc.*, 420 F.3d at 570. At the valuation hearing, the court heard the testimony of two expert witnesses and several lay witnesses, and reviewed hundreds of pages of appraisal reports and other documents. GE's expert opined that the as-is value of the property was $12.9 million based on a fair market value of $13.9 million. The Debtor's expert opined that the as-is value of the property was $8.9 million based on a stabilized fair market value of $11.9 million. Both experts testified that the income approach is the most appropriate methodology for valuing the property. Therefore, starting with the income approach and reaching a stabilized fair market value of $12,675,387, the bankruptcy court deducted various costs derived from the testimony and documents introduced into evidence, and concluded that the value of the property was $10.5 million.

GE argues that the bankruptcy court failed to give sufficient weight to an arms-length offer of Sound View Real Estate Partners, L.L.C. ("Sound View Partners"), the Franklin County Tax Auditor, and the HUD approved value of the project. However, the bankruptcy court specifically stated that it considered this information. (Appellees' App. at 229.) ("The Court did consider all relevant information presented, including the offer of Sound View Partners to purchase the property, the Franklin County Tax Auditor's assessment and GE's underwriter's valuation, but did not find any other indicia of value of the property to be persuasive in the face of the appraisals in evidence.") The bankruptcy court's findings are not clearly erroneous.

## C. *The Bankruptcy Court Did Not Err in Finding that the Plan is Feasible*.

GE asserts that the bankruptcy court erred in confirming the Plan over its objection because the Plan does not satisfy the "feasibility test" under § 1129(a)(11). Pursuant to 11 U.S.C. § 1129(a)(11):

> (a) The court shall confirm a plan only if all of the following requirements are met:
>
>     . . . .
>
>     (11) Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed by the plan.

"Feasibility is fundamentally a factual question since it necessarily depends upon a determination of the reasonable probability of payment." *In re Howard*, 212 B.R. 864, 878 (Bankr.

E.D. Tenn. 1997) (citing *In re Foertsch*, 167 B.R. 555, 566 (Bankr. D.N.D. 1994)). In order to be feasible pursuant to § 1129(a)(11), "[t]he plan does not need to guarantee success, but it must present reasonable assurance of success." *In re Made in Detroit, Inc.*, 299 B.R. 170, 176 (Bankr. E.D. Mich. 2003) (citing *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2nd Cir. 1988)), *aff'd,* 414 F.3d 576 (6th Cir. 2005)). In order to sufficiently establish such reasonable assurance, "a plan must provide a realistic and workable framework for reorganization." *Id*. (citing *Crestar Bank v. Walker (In re Walker)*, 165 B.R. 994, 1004 (E.D. Va. 1994)). Relevant to a finding of feasibility is:

> (1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management; and (6) any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

*Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co., Inc. (In re U.S. Truck Co., Inc.)*, 800 F.2d 581, 589 (6th Cir. 1986). Importantly, "[t]he Code does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility." 7 *Collier on Bankruptcy* ¶ 1129.03[11] (15th ed. rev. 2006) (quoting *Computer Task Group, Inc. v. Brotby (In re Brotby)*, 303 B.R. 177, 191 (B.A.P. 9th Cir. 2003)).

At the valuation hearing, in addition to determining the present value of the Property, the bankruptcy court made other findings with respect to the Debtor's financial prospects.[5] The bankruptcy court found the Plan Proponents' use of these findings and their other assumptions to be reasonable, noting that the assumptions were more conservative than those of even GE's appraisal expert. In regard to the above-quoted factors for determining feasibility, the bankruptcy court concluded, among others, the following: that the Debtor's cash-flow short-fall during the first three calendar quarters post-confirmation will be covered by the interest reserve to be set aside from the

---

[5] These findings included the following: (1) stabilized gross potential income ($2,169,360 annually); (2) annual ancillary income ($90,000); (3) stabilized occupancy (88%); (4) stabilized operating expenses, including real estate taxes and reserves ($970,750 annually); (5) the reasonable absorption rate of the rental units during construction (2.2 units) and upon completion of construction (4.4 units), resulting in the Property reaching stabilization in 19 months; (6) total stabilization costs ($550,000); (7) costs of completion of construction including mold remediation and ancillary site work ($827,659); and (8) total costs to fix flooding problems including construction of a retention pond and storm sewer and site grading ($834,500).

$2.5 million contribution by SIR Kensington; that the demands of the Plan will be met from the $2.5 million infusion as well as completion of the Property; that beginning in the second full year post-confirmation, the Debtor will realize a positive cash flow in excess of $300,000 per year; that the Debtor has had positive cash flow most months and for the entire post-petition period when taken in the aggregate; that capitalization is quite adequate; that in light of the oversight by SIR Kensington and Sound View Partners, management of the Property will be experienced and competent, with a plan to operate the Property in a manner consistent with a goal of optimal performance; that the economic conditions in the area of the Property are at least fair, with no evidence to indicate a downswing; and that the Property has a life span of fifty to sixty years.

Based on ample evidence in the record, the bankruptcy court's finding that the Plan satisfies the feasibility test under 11 U.S.C. § 1129(a)(11) is not clearly erroneous.

**D. *The Plan Does Not Accord GE its Rights as an Electing Secured Creditor under § 1111(b)(2).***

A chapter 11 reorganization plan may be confirmed if each class of impaired claims accepts the plan, or at least one class of impaired claims accepts the plan. § 1129(a)(8), (a)(10). If not all classes of impaired claims accept the plan, the Debtor may utilize the so-called "cramdown" procedure.[6] Under a cramdown, a plan must meet all of the requirements set forth in § 1129(a), except for § 1129(a)(8), and also satisfy § 1129(b).

Section 1129(b)(1) of the Bankruptcy Code permits the bankruptcy court to confirm a plan over the objection of a secured creditor "if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims . . . that is impaired under, and has not accepted, the plan." GE asserts that the Plan is not fair and equitable, in part, because it fails to properly recognize

---

[6] "Cramdown" is a bankruptcy term used when a plan is confirmed over a claim holder's objection. Kenneth N. Klee, *All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code*, 53 Am. Bankr. L.J. 133 (1979); *Till v. SCS Credit Corp.*, 541 U.S. 465, 468-69, 124 S. Ct. 1951, 1954 (2004). The Sixth Circuit BAP has previously discussed "cramdown" in a chapter 13 context in *Tidewater Fin. Co. v. Curry (In re Curry)*, 347 B.R. 596 (B.A.P. 6th Cir. 2006), *aff'd*, 509 F.3d 735 (6th Cir. 2007).

rights as an electing secured creditor under § 1111(b)(2).[7] To qualify as fair and equitable under this subsection as to a class of secured claims, a plan must provide:

> (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims [the "lien retention" provision]; and

> (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property [the "present value" or "interest" provision][.]

§ 1129(b)(2)(A)(i).

The Bankruptcy Appellate Panel for the Ninth Circuit has succinctly explained the process once the § 1111(b)(2) election occurs:

> In order for a reorganization plan to now comply with the cram down requirements of § 1129(b)(2)(A)(i)(I), the electing creditor must retain a lien equal to the total amount of its claim. The lien is not stripped down by § 506(d). Subsection (II) of § 1129(b)(2)(A)(i) guarantees an electing creditor a stream of payments equal to its total claim. However, the stream of payments need only have a present value "of at least the value of such holder's interest in the estate's interest in such property," i.e., the value of the collateral. 11 U.S.C. § 1129(b)(2)(A)(i)(II). In other words, the present value of the electing creditor's stream of payments need only equal the present value of the collateral, which is the same amount that must be received by the nonelecting creditor, but the sum of the payments must be in an amount equal [to] at least the creditor's total claim.

*First Fed. Bank of Cal. v. Weinstein (In re Weinstein)*, 227 B.R. 284, 294 (B.A.P. 9th Cir. 1998) (citations omitted).

---

[7] The Debtor contends that GE has raised this issue for the first time on appeal, and has, therefore, waived this argument. GE did specifically object to the Plan on the basis that the Plan was not fair and equitable, although in the context of interest rate, proposed Plan term and whether as an electing secured creditor under § 1111(b)(2) GE is entitled to a due-on-sale clause in the restructured Note. (This last issue was raised initially on appeal by GE, but counsel for GE announced at oral argument that GE was conceding this issue.) More importantly, the bankruptcy court specifically addressed the rights of an electing secured creditor under § 1111(b)(2) in determining that the Plan was fair and equitable. Accordingly, the issue is properly before this Panel. *See Nicely v McBrayer, McGinnis, Leslie & Kirkland*, 163 F.3d 376, 381 (6th Cir. 1998) (Appellate courts have declined to consider arguments that were not properly raised before the trial court; however, it would be inappropriate not to consider argument where statute was clear on point at issue and where relevant information was clearly before the trial court so that it should not have needed specific presentation of the argument in order to be aware of the proper result.).

Applying the foregoing principles to the case at hand, in order to properly accord GE its rights as an electing secured creditor under § 1111(b)(2), the Plan must provide for the following: (1) retention of GE's lien on the Kensington Property to the extent of the allowed amount of GE's claim, $16,453,965.74 according to GE's proof of claim; (2) deferred cash payments to GE with a present value of $10,258,000 ("the value of such holder's interest in the estate's interest in such property," which in this case is the value of the Kensington Property, $10.5 million, minus outstanding real estate taxes of $242,000); and (3) deferred cash payments to GE totaling at least the allowed amount of GE's total claim, i.e., the $16,453,965.74 sum. *See In re Weinstein*, 227 B.R. at 292-94. Our review of the Plan indicates that the first two requirements are clearly met; the third is less clear.

In pertinent part, the Plan provides for the following treatment of Class 2, comprised solely of GE:

> The Allowed Secured Claim of GE Credit shall be satisfied in full by the Debtor amortizing the amount thereof with interest as follows: i) commencing the first day of the month following the month in which the Effective Date falls and continuing on the first day of each month thereafter, the Debtor shall pay GE Credit the amount of the Allowed Secured Claim of GE Credit, with interest at the rate of six percent (6.0%) per annum, in equal consecutive monthly installments calculated based upon an amortization period of four hundred eighty months from and after the Effective Date. Notwithstanding such amortization period, any unpaid accrued interest and principal shall be due and payable, in full, on February 1, 2043. GE Credit shall retain its lien on Kensington Commons and on any other of Debtor's property securing its Allowed Claim, to the extent of the allowed amount of such Claim; otherwise, the lien shall be void and of no force and effect. . . . [T]he provisions of that certain Mortgage Note and Rider to Mortgage Note dated January 19, 2001, and executed and delivered by Debtor to Armstrong Mortgage Company, shall remain in full force and effect subsequent to the Effective Date. . . . In the event of any inconsistencies between the terms and provisions of this Joint Plan and the terms and provisions of any agreements, instruments or other documents evidencing or otherwise relating to the Allowed Secured Claim of GE Credit, the terms and provision of this Joint Plan, as modified herein, shall control.

(Appellees' App. at 210-11.)

In the definition section of the Plan, "Allowed Claim" is defined as "a claim against Debtor determined as of the Effective Date . . . in respect of which a proof of claim has been filed with the Court . . . as to which no objection to the allowance thereof has been interposed . . . or as to which any such objection has been determined by a Final Order." (Appellees' App. at 180.) "Allowed

Secured Claim" means "an Allowed Claim secured by a lien on property in which Debtor has an interest . . . to the extent of the value (determined in accordance with § 506(a) of the Code) of such creditor's interest in Debtor's interest in such property . . . ." (Appellees' App. at 180-81.)

Applying these definitions to GE's Plan provision, it is clear that GE will receive deferred cash payments with a present value of $10,258,000, since "Allowed Secured Claim" is defined as a claim "secured by a lien on property . . . to the extent of value." The lien retention requirement is satisfied by the third sentence of the quoted Plan provision providing that GE will retain its lien to the extent of its "Allowed Claim," which under the definition section is GE's total allowed claim as set forth in its proof of claim, i.e., $16,453,965.74 or such amount determined by the bankruptcy court after objection. Nothing in the Plan, however, provides that the deferred cash payments to GE will total this same allowed amount.

The Plan Proponents argue that payment in full of GE's "Allowed Claim" is provided by the lien retention statement and cite the amortization schedule presented at trial which shows that by the 24th year of the restructured Note's 36-year term the stream of payments to GE will have totaled $16,453,965.74. The Plan Proponents also assert that because GE will retain its lien until the payments accumulate to this amount, if the Debtor attempts to cash out GE at any earlier time, it must pay GE a "§ 1111(b) premium." (Appellees' Br. at 19.) According to the Plan Proponents, this premium is the difference between GE's total "Allowed Claim" and the outstanding principal balance remaining due under the Note, plus the payments made to the present. Thus, argue the Plan Proponents, "[t]he deferred cash payments that GE receives under the Plan always will total at least the amount of GE's allowed claim, even if the Debtor cashes out GE before the final balloon payment is due under the Plan." (Appellees' Br. at 20-21.)

The problem with this argument is that the Debtor's obligation to pay GE this § 1111(b) premium is not evidenced in either the Plan or the Note. *Cf. IPC Atlanta Ltd. P'ship v. Fed. Home Loan Mortgage Corp. (Matter of IPC Atlanta Ltd. P'ship)*, 163 B.R. 396, 398 (Bankr. N.D. Ga. 1994) (plan note specifically providing that in event of prepayment, electing secured creditor will receive a premium calculated to ensure full payment of creditor's total claim). We are not confident, nor apparently is GE, that this payment is guaranteed by the Plan's lien retention statement. The restructured Note will be in the principal amount of GE's allowed secured claim, $10,258,000, but

the lien is to secure GE's allowed claim of $16,453,965.74. If the restructured Note is paid off early, we question how the lien can continue thereafter to stand for the full $16,453,965.74 since the obligation underlying the lien, the restructured Note, will have been satisfied. *See Chase Manhattan Mortgage Corp. v. Shapiro (In re Lee)*, 530 F.3d 458, 472 (6th Cir. 2008) (observing that once the debt underlying the mortgage is discharged, the creditor no longer holds a perfected lien interest, even though the mortgage is still of record).

In order to insure that GE will receive payments totaling its allowed claim and that its lien will remain in place until full payment has been received, it is necessary for the Note to be restructured in one of two ways. The first is to specifically provide in the Note for payment of the so-called § 1111(b) premium, as previously discussed. The second is to provide for a Note in the face amount of the electing creditor's allowed claim, in this case $16,453,965.74, but with a below-market rate of interest such that the present value of the Note would still only be the present value of the collateral, i.e., the $10, 258,000 sum. *See 7 Collier on Bankruptcy* ¶ 1111.03[6][b].[8] In the instant case, neither of these options nor any other means for ensuring that GE will receive payment in full of its total allowed claim is provided for in the Plan.[9] Without such a provision, the Plan fails to guarantee that GE will receive the full benefits promised an electing secured creditor under § 1111(b)(2). As explained by the court in *Weinstein*:

---

[8] This very observation was made by the bankruptcy court in a footnote in its memorandum opinion. As astutely stated therein:

> In those instances in which the plan proponent contemplates issuance of a note to the secured creditor who elected § 1111(b) treatment, in an amount equivalent to the creditor's claim, § 1129 may not mandate that the interest rate be based on a market rate or the formulaic rate espoused by *Till*. Because application of § 1111(b) requires that the present value of such a note equal only the value of the creditor's collateral, the solution lies in a below-market rate of interest. See Collier ¶ 1111.03[6][b] at p. 1111-37.

(Appellees' App. at 166.)

[9] Remand and subsequent modification of the Plan in accordance with this opinion may not result in GE ultimately receiving a greater distribution than it would have otherwise under the Plan. Mr. Newman testified on behalf of the Plan Proponents that it was the intent of the Plan Proponents that GE would receive payments totaling its allowed claim, regardless of whether GE was paid over the life of the Plan or cashed out early. Thus, while remand will solidify in writing the benefits GE will receive as an electing secured creditor, the financial or practical effort of remand may be a pyrrhic victory.

> The real benefit of the election is that it protects the creditor against a quick sale of its collateral. The amount of the creditor's secured claim may be determined at a time when the value of the collateral is temporarily depressed. Without the election, the debtor could sell the collateral when its value quickly rebounds and net a considerable gain. By making the election, the creditor guards against such an opportunistic sale because it retains a lien on the collateral equal to the full amount of its claim, albeit without interest. If there is a quick sale, the creditor is entitled to payment on its full claim. Similarly, an electing creditor benefits if there is an appreciation in the value of the collateral and the debtor defaults on its plan payments.

*In re Weinstein*, 227 B.R. at 295 n.12. Based on the foregoing, the bankruptcy court erred in finding that the Plan is fair and equitable relative to GE's § 1111(b) election and remand is necessary.

Before leaving this subject we must point out that, contrary to the arguments of GE, the interest payments made to provide present value of the collateral must be applied to reduce GE's total allowed claim. *See* James A. Pusateri, et al., *Section 1111(b) of the Bankruptcy Code: How Much Does the Debtor Have to Pay and When Should the Creditor Elect?*, 58 Am. Bankr. L.J. 129, 136-41 (1984); Klee, 53 Am. Bankr. L.J. at 158. It should be also noted that "the debtor does not have to pay the entire secured claim in the same manner as if it were fully collateralized. If that were not so, every holder of an undersecured claim would make the election." *In re S. Mo. Towing Serv., Inc.*, 35 B.R. 313, 314 (Bankr. W.D. Mo. 1983).

> This result [applying interest payments to reduce the entire claim] gives effect to the plain language of § 1129(b)(2)(A)(I) which merely requires that in a cram down, the creditor making the § 1111(b)(2) election receive a stream of payments equal to its total claim and with a present value equal to the value of the collateral. Requiring anything more would be an unwarranted and unsupportable extension of the statutory requirements of § 1129(b)(2)(A).

*In re Weinstein*, 227 B.R. at 295 n.13.

### V. CONCLUSION

The bankruptcy court's order is AFFIRMED except as to the finding that the Plan is fair and equitable in according GE its rights as an electing secured creditor under § 1111(b)(2). In this respect, the order is VACATED in part and REMANDED for proceedings not inconsistent with this opinion.