**In re MARBLE CLIFF CROSSING APARTMENTS, LLC, Debtor.**

**No. 11–61545.**

United States Bankruptcy Court, S.D. Ohio, Eastern Division.

Feb. 10, 2013.

Pamela Arndt, Daniel Craine, Lawrence Hackett, Columbus, OH, for Asst. US Trustee (Col), Office of the US Trustee.

Adam J. Biehl, Yvette A. Cox, Timothy A. Riedel, Bailey Cavalieri LLC, Columbus, OH, Matthew T. Schaeffer, Columbus, OH, for Debtor.

*MEMORANDUM OPINION AND ORDER DENYING CONFIRMATION OF MARBLE CLIFF CROSSING APARTMENTS, LLC'S REORGANIZATION PLAN (DOC. NOS. 168, 383, 458) AND ORDER TO SHOW CAUSE FOR DISMISSAL WITH PREJUDICE PURSUANT TO 11 U.S.C. §§ 1112(b)(1) AND 349(a)*

CHARLES M. CALDWELL, Bankruptcy Judge.

This Memorandum Opinion and Order serves as the Court's findings of facts and conclusions of law for the plan of reorganization filed on behalf of Marble Cliff Crossing Apartments, LLC ("Debtor"). The only objecting party and holder of the largest secured and unsecured claims, is MTGLQ Investors, LP ("Creditor"). The Creditor and Goldman Sachs are related entities. In this Order, the Court also provides notice that it will consider dismissal with prejudice, at 3 p.m. on March 5, 2013, along with other matters.

Shortly after the conclusion of the multiday confirmation hearing, the Court entered an order detailing dispositive impediments to confirmation. The goal was to allow the parties ample time to consider the deficiencies and further pursue settlement efforts that commenced long prior to the bankruptcy filing. In response, the parties requested that the Court defer issuance of a final ruling to allow for the continuation of settlement discussions.

Unfortunately, they were still unable to resolve their differences, and even more conflicts hatched, including whether the Debtor may now file an amended plan and if so, whether the Court should extend the Debtor's exclusive period to confirm any new plan and/or iteration of old plans filed and then withdrawn, and then perhaps filed again. Additionally, the Creditor filed a second motion to convert as an alternative to plan confirmation, and the Creditor has yet again expressed its belated intent to file a plan.

From the Court's perspective, this twoparty dispute has unique complexities that warrant amicable resolution rather than judicially imposed solutions. There is essential agreement on value, the balance due and validity of the lien. Most importantly, both the Debtor and the Creditor are hostage to the fact that this upscale apartment complex sits atop a former quarry filled with construction and organic debris. Methane gas is present, and a costly remediation plan is underway. It

will take years, if ever, before the environmental complications will no longer hinder refinancing or sale of the property. Like the movie characters, Thelma and Louise, the Debtor and Creditor are bound tight and heading in the same direction.

The Debtor, known as Marble Cliff Commons Apartments, operates an upscale rental community in Columbus, Ohio, and on the edge of the relatively more affluent city of Upper Arlington, Ohio. The construction of Marble Cliff Commons, on the 30–acre property, commenced in 2002. It includes 276 units comprised of one to three-bedroom apartments, three-bedroom ranch-style homes, a dog park and a 7000 square feet community center with concierge services, exercise rooms and a cinema.

The Debtor is an Ohio limited liability company, and its members include BCA Trabue Road, Ltd. ("BCA"), JJC Trabue Road, Ltd. ("JJC") and Dale Armstrong. BCA is the managing member for the property, and Mr. Brad C. Armstrong ("Mr. Armstrong"), is its sole owner. Dale Armstrong is his father. Mr. Armstrong also owns Armstrong Mortgage Company ("Armstrong Mortgage"). On behalf of the Debtor, Armstrong Mortgage originated a $30 million-dollar, thirty-two year loan, guaranteed by the Department of Housing and Urban Development ("HUD"). Armstrong Mortgage received a 1.5% fee for this task, amounting to approximately $450,000. Mr. Armstrong testified that HUD was aware of this relationship, and indeed, it was not in conflict with any regulations, at the time. Attorneys, John J. Chester, Jr. and James J. Chester own JJC, and from the inception JJC served as a passive investor.

Scioto Management Group, LLC ("Scioto Management") operates the apartment community, and has done so since the completion of construction. Mr. Armstrong also owns Scioto Management, and it currently operates approximately 1000 properties in total. It charges the Debtor a 4% management fee based upon net income. Mr. Terrance D. O'Keefe ("Mr. O'Keefe") originally owned the quarry property, and he served as the developer and builder for the project. Mr. O'Keefe hired the architect and provided the blueprints.

Immediately prior to the bankruptcy filing, however, the other LLC members purchased Mr. O'Keefe's interest in the Debtor for $600,000.00. According to the testimony, Mr. O'Keefe did not want to participate in the Chapter 11 proceeding, and was unable to make capital contributions. This transaction also included providing Mr. O'Keefe a rent-free apartment at Marble Cliff Commons, $2,000.00 per month for "management-related services" payable to his former spouse, in addition to providing his former spouse a subsidized apartment at Marble Cliff Commons.

Construction was completed and the apartment community opened in April 2003. The Debtor projected execution of a substantial number of leases within 18 months. However, by July 2003, major and apparently unanticipated construction began on the main access road to the property. It lasted an entire year. As a result, by the end of the first year the complex was only approximately 40% occupied. Mr. Armstrong testified that during this period letters of credit kept the project afloat, in addition to member advances.

Once the road was completed, Mr. Armstrong testified that the housing boom and enhanced credit availability made owning a home comparable to renting at Marble Cliff Commons. He testified that conse-

quently, by 2005, the complex reached an occupancy rate of only approximately 82%, and below the projected rate of 95%. In December 2005, the Debtor restructured the HUD-guaranteed loan from an interest rate of 7.25% to 5.25%.

However, financial conditions further deteriorated in late 2008, and Mr.. Armstrong testified the LLC members began workout discussions with HUD. The Debtor could not meet cash flow and occupancy projections, and Mr. Armstrong testified he began personally paying some investors involved in workout discussions, and he began making loans to the Debtor to cover operating expenses. After the HUD-guaranteed loan went into default, HUD demanded assignment to their loan portfolio in January 2010. Ultimately, later that year, HUD sold the loan at auction, and the Creditor purchased it for the discounted amount of $23,250,099.00.

Almost immediately, the members of the Debtor and the Creditor's representatives began negotiations to restructure the loan. The discussions led to a forbearance agreement that allowed the Debtor a breathing spell to pursue refinancing options. This agreement cost the Debtor approximately $500,000.00 taken from its operating funds. This large sum could have been used to defray ordinary business expenses and/or pay real estate taxes that later became delinquent. The LLC members pursued several arrangements with numerous parties and related financial institutions, but they found only one deal suitable, even in the face of losing the large amount of money already paid for the forbearance agreement.

In 2011, the members of the Debtor began negotiations with a Mr. Richard Foster ("Mr. Foster"), who has an office nearby, and owns commercial and apartment properties in the Columbus area. In October 2011, Mr. Foster retained the services of a Mr. Andrew G. McCorkle, an employee of Civil & Environmental Consultants, Inc. ("CEC"), to perform environmental studies. However, this one, preferred transaction, never closed because Mr. Foster's due diligence revealed, apparently to the surprise of all, that there were significant methane gas levels at the apartment community.

According to the testimony, Mr. Foster needed to reinvest funds within a brief period. For this reason he was unable to continue the protracted due diligence necessary to fully weigh the significance of the environmental concerns. This final glitch and imminent foreclosure, prompted the instant Chapter 11 filing on November 17, 2011, and then led to the court-approved retention of CEC to manage the ongoing methane gas remediation project.

In addition to the methane gas discovery, the Debtor experienced catastrophic, weather-related insurance losses that prompted the cancellation of coverage provided by Eerie Insurance Company. The Debtor's current policy with Westfield Insurance Co. ("Westfield") was issued on April 28, 2009, and prior to the discovery of methane gas. Indeed, the Debtor's independent insurance broker testified that he was not aware of the methane gas problem until he was deposed in October 2012.

Now, we also have a personal injury claim based upon alleged methane gas exposure. Until recently, the record demonstrates that the Debtor was under-insured, and its current annual premium of approximately $49,000 may increase by an extra $17,000. Most significantly, the current insurance policy with Westfield will expire in April 2013. From the testimony, the

Court finds that even if coverage is available, it will be at a significantly greater cost.

To utter that this case, with its 500–plus pleadings and counting, has been contentious, is an understatement. However, there have been significant positives along the way. First, the occupancy rate has increased to nearly 100% with a healthy waiting list. Even with full disclosure of the environmental concerns, this remains the case. Second, the Court approved a $744,900 remediation plan that may reduce methane gas to acceptable levels, but over a number of years. Truly, this is the light at the end of the tunnel and should be the paramount concern of the Debtor and Creditor. Other issues pale in comparison.

Third as part of the cash collateral arrangements, the Debtor has paid the Creditor monthly payments of $150.883.93. Fourth, the Debtor and the Creditor were able to stipulate to a value of $ 32,500,000 for the property, and that the Creditor holds an allowed secured claim of $31,750,708.03. This amount includes principal and accrued interest of $30,599,691.01 and $1,151,017.02 for real estate taxes, interest and penalties that the Creditor paid when it acquired the claim of the Franklin County, Ohio Treasurer. As a result, there is a modest equity cushion of approximately $750,000.

The good news ends here with the litigation of the Debtor's current plan, and the discussion of its feasibility and whether it provides fair and equitable treatment. In sum, the Debtor has offered to pay the Creditor in full, but over thirty-two years with interest in the range of 2.25% to 2.85%. This offer is a puzzler since HUD sold the loan at auction more than a year ago, and the proposed "new" loan is not HUD-guaranteed. Tragically, the Debtor bases its financial projections and all of its other evidence, upon the faulty premise that HUD-like terms are readily available to this Debtor.

To the contrary, the Creditor has offered evidence that is more credible. It demonstrates that presently multi-family housing loans are in the ten-year range. In addition, the more credible evidence presented by the Creditor persuades the Court that there may be no new financing available at all, HUD-guaranteed or private-sector, given the environmental issues. Even assuming the Debtor is able to obtain any financing today, the Creditor's more credible evidence demonstrates that a substantially higher interest rate would be charged.

Testimony presented by the Creditor identifies a rate as high as 8.25% to account for the enhanced risks. This rate starts with the prime interest rate of 3.25% and is augmented by: **a.** 1% because the apartment complex is the Debtor's only income source and the equity cushion of approximately $750,000 is deemed marginal compared to the risk of continuing to carry the loan; **b.** 1% for the presence of methane gas and the lack of lender reserves and carve-out guarantees; **c.** 1% for the asserted lack of plan feasibility; and **d.** 2% due to the proposed length of the loan at thirty-two years.

Now to the Court's ruling, proof by a preponderance of the evidence is the standard to secure confirmation. However, it remains the court's independent obligation to determine whether proponents have satisfied all relevant confirmation requirements. *In re Trenton Ridge Investors, LLC, et al.,* 461 B.R. 440, 458–462 (Bankr.S.D.Oh.2011). In this case, the

Court must consider all the general confirmation provisions detailed in Section 1129(a)(1)–(16) of the United States Bankruptcy Code ("Code"). In addition, since we have an objecting impaired creditor, the Court must also weigh the "cramdown" provisions detailed in Section 1129(b)(1), (2) of the Code.

 Regarding, the sixteen general confirmation requirements, the one in question here is feasibility. Plan proponents are not guarantors of success, rather reasonable assurance, demonstrated by a roadmap to plan consummation, is the goal. In this endeavor, the focus is not only on ability to deliver upon what has been promised in the plan. The ability to respond to additional and inevitably unforeseen financial needs that result from post-petition operations, must also be considered. *In re Arts Dairy, LLC,* 432 B.R. 712, 717 (Bankr.N.D.Oh.2010). Regarding the requisite financial projections, they are assessed not only for whether they are supported by past performance, but they must also be scrutinized to glean whether the underlying assumptions are sound. *In re Trenton Ridge Investors* at 485.

 Feasibility has been defined as a dispositive hurdle that if not surmounted, precludes consideration of objections to the other fifteen general factors. *In re Olde Prairie Block Owner, LLC,* 467 B.R. 165, 169 (Bankr.N.D.Ill.2012). Courts are cautioned not to confuse feasibility with challenges to the debtors' good faith in proposing plan terms. *In re Trenton Ridge Investors* at 471–472. Indeed, the proposals may be the best offers that debtors can make, but still not be sufficient to demonstrate realistic probabilities of success. *In re Geijsel, et al.,* 480 B.R. 238, 256 (Bankr.N.D.Tex.2012).

 Where the prospects for success are marginal, the focus shifts to whether there are viable protections for secured creditors, if the plans fail. *In re Geijsel* at 256–257. Finally, the factors typically considered include capitalization adequacy, financial performance, relevant market conditions and the effectiveness of the management team that will guide execution of the plan terms. *General Electric Credit Equities, Inc. v. Brice Road Developments, L.L.C. et al. (In re Brice Road Developments, L.L.C.),* 392 B.R. 274, 283 (6th Cir. BAP 2008).

 Turning to whether the Debtor's plan may be confirmed over the objections of the Creditor ("cram-down"), the concept of "fair and equitable" means that the lien interests are retained and that deferred payments equal the present value of the interests. *In re Geijsel* at 271. Interest must be provided to impaired objecting secured creditors at a level approximating rates payable in the market for loans of comparable risk and length of repayment. *In re Seasons Partners, LLC,* 439 B.R. 505, 517 (Bankr.D.Ariz.2010).

The questions that must now be answered are whether confirmation of the present plan will most likely "... be followed by the liquidation, or the need for further financial reorganization, of the debtor ..." and whether the proposed plan is "... fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(a)(11) and (b)(1).

 Based upon the testimony, including assessment of relatively credibility and documents received into evidence, the Court finds and concludes that the Debtor has failed to establish that the plan, in its

present form, is feasible and represents a fair and equitable effort to reorganize and restructure the financial relationship with the Creditor. These two issues are closely related, and factors such as interest rates and length of repayment terms, are integral to the resolution of both. In the Court's view, they must be treated as a single concern.

Regarding the proposed thirty-two year repayment term, this protracted payout generates greater exposure to fluctuations in demand for apartments, based upon the economy and entrance of competitors to the market. Over time, this may lead to increased vacancies and plan payment defaults. In addition, over a thirty-two year period and as the project ages, there will be major repair and replacement costs. Over thirty-two years, there is greater risk that additional environmental concerns may arise, despite the current remediation plan. Finally, the inordinate repayment term increases exposure to a project with a history of payment defaults, from its inception.

In addition, the Debtor's current plan does not provide any additional capital contribution from the members. The testimony indicates that they have never received a distribution and from all appearances have acted responsibly to improve occupancy rates and address the methane gas exposure. However, in the face of a history of default from the inception of this project, they are asking this Court to impose a "new" loan upon the Creditor without any assurance of an irrevocable financial commitment from their side of the table.

Instead, the members have served up in a colander a loan commitment of $1,500,000.00. What remains are reservations and contingencies so significant that the commitment is tepid at best. Further, the commitment that has been provided is not supported by any credible evidence of the principals financial ability to follow through when the need arises, including for example financial statements, bank account records, and tax returns of the members and their related entities, BCA, JCC, Armstrong Mortgage and Scioto Management. In this same vein, the Debtor has failed to offer assurances such as reserves for real estate taxes, capital improvements and carve-outs for mismanagement.

Almost immediately, additional risk arises from the Debtor's possible inability to obtain future insurance coverage. The current policy expires in April 2013, and the evidence demonstrates that the current insurer was not aware of the methane gas problem. Credible testimony demonstrates that remediation efforts may not be immediately and completely effective, and that additional significant future costs are likely. Specifically, because of the heterogeneous nature of the fill material, it is difficult initially to pinpoint all areas that may require remediation.

Further, the evidence demonstrates that even if the remediation plan is completely effective, after several years, the Debtor will never receive formal verification from environmental authorities because to the Debtor's credit, it did not wait to have them come knocking on the door. This lack, and the law of unintended consequences, may well serve as a perpetual drag on the value, marketability and refinancing opportunities available to the Debtor. Even assuming that the Debtor's financial projections are reasonably accurate, all the risks detailed above significantly outweigh their reliability. Only a magician could conjure up reliable numbers to support a thirty-two year payout.

The audience for this Order is painfully aware of the case law and its use of heady

terms such as, "efficient market", "risk adjustment", "prime rate" and "treasury rate", etc. In the humble view of this Court, these terms are merely elegant ways of describing the rather mundane domestic chore of deciding how the pie gets cut. They are nothing more, and nothing less. Those that read this deep into the Order also will be more than painfully aware, that the Court perceives this case to be unique, both in its challenges and opportunities to do something novel-assist all combatants.

With that fresh concept in mind, the following roadmap is drawn. First, in the Court's view, the prime rate is the appropriate starting point for this case. Persuasive evidence presented by the Creditor establishes that the type of loan the Debtor wants is not available in the current market. Second, reducing the repayment term to ten years, amortized over the remaining term of the former loan, is the next step. Third, providing an irrevocable capital contribution of $1,500,000 when factored along with the current high occupancy rate, should provide a significantly greater assurance of future performance.

Fourth, establishing jointly-controlled reserve accounts for taxes, insurance, capital improvements and extraordinary expenses, should greatly reduce the risk of eroding the Creditor's secured position during a ten-year repayment period. Fifth, a mismanagement carve-out, coupled by the capital contribution, ensures that the allocation of risk between the Debtor and the Creditor is as close to fair as we will ever achieve in this case. Such adjustments, by the Creditor's own calculations, should shave approximately three points off its suggested rate of 8.25%. However, these are merely the Court's suggestions. Only the parties can cut the pie. Whether this melodrama ends with smiles or tears is up to the parties, but end it must.

In sum, the Court finds and concludes that the Debtor has failed to sustain its burden to prove that the plan, in its current form, is feasible and that it represents a fair and equitable resolution of the Creditor's interests. Confirmation is **DENIED.**

**IT IS FURTHER ORDERED,** that on March 5, 2013, at 3:00 p.m. in Courtroom B, 170 North High Street, Columbus, Ohio, the Court will conduct a hearing for the Debtor, Creditor and other interested parties to show cause why this case should not be dismissed with a bar to filing any further bankruptcy proceedings, until the foreclosure process may be concluded.

The Court takes this action to provide notice that the it may consider an alternative to conversion to Chapter 7, as yet again requested by the Creditor. Because of the environmental issues and the fact that this case essentially involves a dispute between two parties, conversion may not be the appropriate and most cost-effective manner to terminate this reorganization proceeding.

**IT IS SO ORDERED.**