*By order of the Bankruptcy Appellate Panel, the precedential effect
of this decision is limited to the case and parties pursuant to 6th
Cir. BAP LBR 8013-1(b). See also 6th Cir. BAP LBR 8010-1(c).*

**File Name: 09b0008n.06**

**BANKRUPTCY APPELLATE PANEL OF THE SIXTH CIRCUIT**

| | |
|---|---|
| In re: JACK V. OAKLEY, *et al.*, | ) |
| | ) |
| Debtors. | ) |
| | ) |
| —————————————————— | ) |
| | ) |
| ELIZABETH H. DOUCET, TRUSTEE | ) |
| and CITIZENS BANK OF LOGAN, | ) |
| | ) |
| Appellees, | ) |
| | ) |
| v. | ) No. 08-8102 |
| | ) |
| DRYDOCK COAL CO., *et al.*, | ) |
| | ) |
| | ) |
| Appellants. | ) |
| —————————————————— | ) |

Appeal from the United States Bankruptcy Court
for the Southern District of Ohio, Eastern Division
Bankruptcy Case No. 03-59297; Adv. No. 05-2289

Argued: November 3, 2009

Decided and Filed: December 2, 2009

Before: BOSWELL, HARRIS, and SHEA-STONUM, Bankruptcy Appellate Panel Judges.

——————————————

**COUNSEL**

**ARGUED:** Kenneth C. Johnson, BRICKER & ECKLER LLP, Columbus, Ohio, for Appellants.
William B. Logan, Jr., LUPER, NEIDENTHAL & LOGAN, Columbus, Ohio, for Appellees. **ON
BRIEF:** Kenneth C. Johnson, Justin W. Ristau, BRICKER & ECKLER LLP, Columbus, Ohio, for
Appellants. William B. Logan, Jr., Kenneth M. Richards, LUPER, NEIDENTHAL & LOGAN,

Columbus, Ohio, Elizabeth H. Doucet, ELIZABETH H. DOUCET & ASSOCIATES, Lake Charles, Louisiana, for Appellees.

_____

**OPINION**

_____

G. HARVEY BOSWELL, Bankruptcy Appellate Panel Judge. This appeal involves an alleged lost, written agreement among the shareholders of a closely held family corporation restricting the transfer or pledge of stock. The dispute stems from Jack V. Oakley's ("Debtor") pledge of stock to Citizens Bank of Logan ("Citizens") as collateral for a $1 million loan prior to filing for bankruptcy protection. After the Debtor filed for bankruptcy protection, the chapter 7 trustee ("Trustee") and Citizens filed an adversary complaint seeking a declaratory judgment that the alleged agreement restricting pledge of the stock was of no effect. The shareholders filed a counterclaim seeking judgment that the agreement is valid and that they had the right to purchase the pledged shares for $400 per share. Following a five day trial, the bankruptcy court found that the shareholders failed to prove the material terms of the alleged agreement. For the reasons that follow, we affirm the judgment of the bankruptcy court.

## I.   ISSUE ON APPEAL

The issue raised by this appeal is whether the bankruptcy court erred in finding that the Appellants failed to carry their burden of proving the material terms of their alleged agreement restricting the transfer or pledge of the stock in their closely held family corporation.

## II.   JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction to decide this appeal. The United States District Court for the Southern District of Ohio has authorized appeals to the Panel, and no party to the appeal has timely elected to have this appeal heard by the district court. 28 U.S.C. §§ 158(b)(6), (c)(1). A final order of the bankruptcy court may be appealed as of right pursuant to 28 U.S.C. § 158(a)(1). "[A] decision is ordinarily considered final and appealable under § 1291 [and § 158(a)] only if it 'ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.' " *Quackenbush v.*

*Allstate Ins. Co.*, 517 U.S. 706, 712, 116 S. Ct. 1712, 1718 (1996) (quoting *Catlin v. United States*, 324 U.S. 229, 233, 65 S. Ct. 631, 633-34 (1945)); *Wicheff v. Baumgart (In re Wicheff)*, 215 B.R. 839 (B.A.P. 6th Cir. 1998). The bankruptcy court's judgment resolved the adversary proceeding on its merits and is a final, appealable order. *See Lyon v. Eiseman (In re Forbes)*, 372 B.R. 321, 325 (B.A.P. 6th Cir. 2007).

The court's findings of fact are reviewed under the clearly erroneous standard. *Riverview Trenton R.R. Co. v. DSC, Ltd. (In re DSC, Ltd.)*, 486 F.3d 940, 944 (6th Cir. 2007). "A finding of fact is clearly erroneous 'when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *Id.* (quoting *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573, 105 S. Ct. 1504 (1985)).

The bankruptcy court's legal conclusions are reviewed *de novo*. *Gen. Elec. Credit Equities, Inc., v. Brice Rd. Devs., LLC (In re Brice Rd. Devs., LLC)*, 392 B.R. 274 (B.A.P. 6th Cir. 2008). "*De novo* means that the appellate court determines the law independently of the trial court's determination." *Treinish v. Norwest Bank Minn., N.A. (In re Periandri)*, 266 B.R. 651, 653 (B.A.P. 6th Cir. 2001) (citations omitted).

## III.   FACTS

In 1940, Jack Oakley's ("Debtor") ancestors founded Drydock Coal Company ("Drydock"). In 1979, the Debtor acquired 100 shares of Drydock from his father. On May 14, 1981, the Debtor executed the Jack Victor Oakley Trust Agreement ("Trust"), a revocable trust for estate planning purposes, and transferred his 100 shares to the Trust. His son, Timothy Oakley, was named as the Trust's trustee. The Trust provided that upon the death of the Debtor, his shares of stock were to be transferred to his four sons equally. Following the death of the Debtor's father later in 1981, the Debtor acquired an additional 525 shares which he also transferred to the Trust. Upon the death of the Debtor's father, the IRS valued the stock at $400 per share for estate tax purposes.

On October 20, 1981, the Debtor and his four sons entered into a purchase agreement in which each son purchased 65.625 shares for $400 per share from the Trust. That agreement contained no restriction on the pledge or transfer of Drydock stock. On that same date, each of the

four sons made a down payment of 10% and signed a promissory note to the Trust for the remaining 90% owed. The promissory notes made no reference to a restriction on the pledge or transfer of Drydock stock.

The Appellants (defined below) assert that they also executed a buy-sell agreement on October 20, 1981, (the "1981 Agreement") which imposed a lifetime restriction on transfers of any kind, including pledging stock as security. The 1981 Agreement allegedly stated that upon the death of any shareholder, Drydock would purchase the shares, and if any shareholder breached the 1981 Agreement, the company had the option to repurchase the shares. Finally, Mark Oakley testified that the agreement stated that once at least two shareholders died, the agreement automatically terminated. The Appellants further asserted that the purchase price for shares under the 1981 Agreement was $400 per share.

On December 15, 1981, Drydock purchased 25 shares from the trust at $400 per share and transferred them to Margaret Galvin, a long time secretary of Drydock and distant relative of the family by marriage. The purchase agreement between the Trust and Drydock does not reference any restrictions on the transfer of Drydock stock. According to Mark Oakley's testimony, although the Appellants could not locate any documents, Margaret Galvin agreed to the 1981 Agreement at that time, and all shareholders agreed to the transfer of stock to her. Following this transaction, the Debtor's Trust held a controlling interest of approximately 54% of the shares of Drydock. The remaining shares were held by the Debtor's sons, Mark, Gregg, Timothy, and John, and Margaret Galvin (collectively with Drydock "Appellants").

Each of the stock certificates held by the shareholders, which were issued in December, 1981, contains a legend which reads:

> The shares of stock represented by this certificate are subject to an agreement dated October 20, 1981, a copy of which [Drydock] will mail to the holder of this certificate, without charge, within five (5) days of receipt of a written request therefor, and said shares may not be sold, transferred, assigned, pledged, hypothecated, or otherwise disposed of, except in strict accordance with the terms of that agreement.

4

(Appellants' App. at 1343.) Despite searching a large safe maintained by Drydock, Drydock's files, the personal files of each of the shareholders, and files of outside counsel and accountants, neither the original agreement referenced in the stock legend nor any copy of the 1981 Agreement has been found. While each of the shareholders has maintained their original stock certificates, none of them maintained a copy of the 1981 Agreement. In fact, each Appellant testified that they have not seen this agreement since it was executed in 1981. In addition, while minute books of Drydock were maintained throughout the years, there is a gap in the books between approximately 1977 and 1984.

On April 24, 1984, Mark Oakley executed a Last Will and Testament in which he directed that his executor "recognize and comply with the provisions of a certain buy-sell agreement executed October 20, 1981, by and among myself, my brothers Gregg, Timothy, and John, and said Drydock Coal Company, concerning said shares, as said buy-sell agreement now reads or as it may be amended from time to time . . . ." (Appellants' App. at 1243.) No copy of the 1981 Agreement was attached to or maintained with this Last Will and Testament.

In the early 1990s, Drydock was involved in litigation with the United Mine Workers which Mark Oakley feared threatened the existence of Drydock. In connection with that litigation, Mark Oakley wrote several letters to Drydock's counsel, Robin Hoke, two of which were introduced at trial on the subject adversary proceeding. The first such letter was dated December 11, 1993, and explained the history and assets of Drydock. In that letter, Mark Oakley stated, in pertinent part:

> Most of these shares [held by the Trust] were purchased by my father from the estate of my grandfather for $400.00 (?) per share in 1981 (actually, he took the shares in lieu of cash of equal value) This estate was audited by the I.R.S. He immediately sold to us our shares at the price per share of $400.00.
>
> These shares are all subject to a buy-sell agreement, by and among the shareholders and Drydock, at the price of $400.00 per share. (This price is subject to modification per the terms of the agreement, but the price has never been changed.)

(Appellants' App. at 1221.) In the second letter, dated February 3, 1994, Mark Oakley again stated that the shares were subject to a buy-sell agreement, and:

5

> So that Drydock has the cash to exercise its rights thereunder to purchase the trust shares referenced above, it owns and pays the premiums on a life insurance policy on [Debtor], face amount $250,000, the stated purchase price for the trust shares.

(Appellants' App. at 1311.)

On December 30, 1997, the Debtor executed a Memorandum of Trust naming John G. Oakley as successor trustee of his Trust. No mention of the 1981 Agreement or restriction on transfer of stock is made in this document. On November 19, 1999, the Debtor executed an Amended Memorandum of Trust removing Timothy Oakley as trustee, naming himself as trustee, and naming Timothy Oakley as successor trustee. Once against there was no mention of the 1981 Agreement or restriction on transfer of stock. In addition, he amended the dispositive feature to provide that 20% of his stock in Drydock would be transferred to his wife, Saranne Oakley, upon his death with the remaining 80% to be split evenly among his four sons.[1]

In April 2000, the Debtor, the Trust, and Cardinal Glenn, Inc., borrowed $1 million from Citizens Bank of Logan ("Citizens") as funding for a golf course development. In addition to certain real estate being pledged as collateral for the loan, the Debtor pledged the Trust's 337.5 shares of stock in Drydock as collateral. When he pledged the stock, the Debtor provided Citizens an affidavit which stated: "I have authority under the [agreement governing the Trust] to pledge the subject stock as collateral for loan purposes and have, by separate instruments so elected to pledge said common stock to [Citizens]." (Appellants' App. at 1231.) Citizens took possession of the Trust's stock certificate which contained the legend referencing the 1981 Agreement; however, not until litigation later ensued did it request a copy of the 1981 Agreement from Drydock.

At the trial before the bankruptcy court, the Debtor asserted that he never intended to pledge the stock. According to his testimony, the lawyers and bankers involved in the loan process were

---

[1] Witnesses testified to this change in the dispositive feature as reflected on Exhibit L at trial. This Panel has not been provided with a copy of Exhibit L, but we have gathered from the remainder of the record that it is another amendment to the Trust which was executed on October 20, 1999.

at his home when he showed them the stock certificate to demonstrate that he owned the stock as an asset. He did not know that they had taken it. In addition, he asserted that the above quoted paragraph of the affidavit was not on it when he signed the affidavit although he did not deny signing the affidavit.[2]

On August 3, 2001, the Debtor signed an amendment to the Trust, purporting to give 5% of his stock, 1% each, to his wife and four sons. The document purporting to effect this amendment makes no mention of a restriction on the transfer of Drydock stock.

On August 20, 2001, the Debtor and the Trust filed suit in state court against Citizens for breach of contract in connection with the loan for the golf course development. Despite numerous requests in connection with that litigation, the Debtor and Drydock were unable to produce the 1981 Agreement referenced on the stock certificates.

In connection with that litigation, the shareholders of Drydock attempted to recreate the lost 1981 Agreement. In April 2003 they executed a "restatement" of the lost agreement with the assistance of attorney David Morrison. Testimony at the trial of this adversary proceeding revealed that in the early 1980s, the Debtor, an attorney, was also in private law practice. After graduating from law school, Mark Oakley joined the law practice. Drydock and the law practice shared common office space. According to the testimony of Mark Oakley, the library of that common office space contained Volume 1 of the Ohio Transaction Guide Legal Form book. When searching for the original 1981 Agreement, Mark Oakley found what he asserts is the form which was used by his brother Gregg Oakley, who had just taken the bar exam in 1981, to draft the 1981 Agreement with Gregg Oakley's penciled notations in the margins. This resulted in the use of that form to "restate" the 1981 Agreement.

Attorney David Morrison, who has represented Drydock in certain matters, testified regarding the creation of the 2003 restatement of the 1981 Agreement. According to Morrison's testimony, which was given after Drydock granted a limited waiver of the attorney-client privilege to allow him

---

[2] The bankruptcy court specifically found this testimony incredible.

to testify at trial, it was he that noticed first that the legend on the Drydock stock certificates was identical to that in the Ohio Transaction Guide and led him to suggest to Mark Oakley that perhaps Drydock personnel had used a copy of that book to draft their 1981 Agreement. Mark Oakley then apparently located Drydock's copy of the book and found faint pencil markings on it which he recognized as Gregg Oakley's handwriting. Mark Oakley then darkened the pencil markings on the form to copy the pages and fax them to Morrison. Morrison's testimony also reveals that he worked exclusively with Mark Oakley on the 2003 document and did not speak with Gregg Oakley, who allegedly drafted the 1981 Agreement, until after the 2003 document was completed and signed.

Gregg Oakley testified that while he had no direct recollection of drafting the 1981 Agreement he believed he would have been the one to draft it because he had recently been in law school and had taken classes on some of the issues raised by the agreement. He recognized his handwriting in the margins of the form book, but also had no independent recollection of making the marks. Gregg Oakley further testified that he would have given the book to a secretary to type the agreement. Certain details were left blank, however, including the purchase price, and he was unable to recall how the secretary would have known what to include. While Gregg Oakley acknowledged having drafted another such buy-sell agreement for a client in 1990, he denied that the marks in the form book could have been related to that work because he would have used a computer at that time. Finally, Gregg Oakley stated that beyond understanding that he could not transfer his shares, he had no specific recollection of the terms of the 1981 Agreement.

The 2003 restatement purports to replicate the original agreement as closely as possible. To that end, it states:

> *The corporation and the shareholders, except Margaret A. Galvin, who was not a shareholder at the time, made a written agreement, dated October 20, 1981, restricting the transfer of Drydock stock. An amendment to this written agreement was made on December 24, 1981, to provide for the acquisition by Margaret A. Galvin of 25 shares of Drydock stock, to be held by her subject to all of the*

*provisions of the agreement; and this written agreement remains otherwise unchanged to this date.*[3]

*After a diligent search, the corporation and its shareholders cannot find that agreement, and they cannot precisely remember its exact terms.*

*The corporation and the shareholders desire to honor their commitments under that agreement, whatever those commitments may have been, as nearly as possible.*

*To that end, the corporation's management has found a draft form for a mandatory buy-sell agreement, with marginal notations that were made when the original agreement was prepared, which requires that the stock certificates contain a legend that is identical to the legend actually appearing on the certificates for the corporation's stock.*

*The corporation and the shareholders believe that the lost agreement form was in the same form as, or very similar to, the agreement form that was found.*

*Therefore, in the spirit of compromise, and desiring to honor their commitments under the lost agreement as nearly as possible, the corporation and the shareholders agree to replace and restate the lost agreement with this new form agreement, which is made according to the draft agreement form that was found.*

(Appellants' App. at 15.)  Included in the provisions of this restated agreement is a prohibition against transferring, assigning or encumbering the shares.

On June 20, 2003, the Debtor and his wife, filed a joint voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Their case was converted to chapter 7 on May 17, 2004, and Elizabeth Doucet ("Trustee") was appointed chapter 7 trustee.  Prior to the filing of this petition, the Debtor revoked the Trust which held Drydock stock.

---

[3] In addition to being unable to locate the 1981 Agreement, the Appellants were unable to find the amendment to the agreement referenced here or any documents signed by Ms. Galvin in connection with her acquisition of 25 shares of Drydock stock.

On June 10, 2005, Citizens and the Trustee initiated an adversary proceeding against all holders of Drydock stock seeking a declaratory judgment that the provisions of the restatement of the 1981 Agreement restricting the transfer, assignment or encumbrance of the shares were of no effect and did not replace the original agreement. The defendants in the adversary proceeding filed an answer and counterclaim in which they sought an order declaring that the 1981 Agreement was a valid restriction on the transfer of the pledged stock and gave the defendants the right to purchase the pledged shares at $400 per share. During the course of the litigation, the Trustee and Citizens reached an agreement that, if they were unsuccessful, they would split any funds received equally, and if they were successful, Citizens would receive 80% of proceeds recovered and the Trustee would receive 20%. On June 19, 2007, the bankruptcy court entered an order approving this compromise.

Prior to the trial on the claims of the Trustee and Citizens, the parties entered into certain stipulations which provided that if the Appellants proved the existence and terms of the 1981 Agreement, they would be entitled to purchase the Debtor's pledged stock for $135,000. If the Appellants were unsuccessful, the stock would not be subject to any transfer or pledge restriction, and the Trustee and Citizens would split any proceeds recovered from the stock per their compromise.[4]

In February 2008, the bankruptcy court held a five day trial solely on the issues of the existence and terms of the alleged 1981 Agreement. At trial, the Appellants introduced testimony to demonstrate that they had made a diligent search for the lost 1981 Agreement and secondary

_____

[4] The pertinent stipulations read: "In the event that the [Appellants] are successful in proving the existence and terms of the 1981 Agreement, then 1) the stock in the hands of the trustee is subject to the terms of the agreement as proven, 2) Drydock and its shareholders shall repurchase the trustee's shares for the amount of $135,000 pursuant to the terms of the agreement, or for some other greater amount as may be ordered by the Court, and 3) [Citizens] and the Trustee will split any recovery as a result of that stock ownership in the manner contemplated by the settlement between the estate and [Citizens]. In the event that the [Appellants] are not successful in proving the existence and terms of the 1981 Agreement, then the stock in the hands of the Trustee is not subject to any restriction imposed by any buy sell agreement, and [Citizens] and the Trustee will split any recovery as a result of that stock ownership in the manner contemplated by the settlement between the estate and [Citizens]." (Appellants' App. at 109-110.)

evidence, in the form of testimony and documents, of the existence and terms of the 1981 Agreement.[5]  Each of the shareholders of Drydock, including Margaret Galvin by deposition, testified that they understood there to be a restriction on transfer of their shares of Drydock.  None of them could recall, however, the exact terms of the agreement, nor had they seen it since they purported to sign it in 1981.  Galvin, who was 86 years old at the time of her deposition, had worked for Drydock from 1943 to 1983 and, while she testified that she understood there was a restriction, she did not recall ever signing the alleged agreement.

On November 22, 2008, the bankruptcy court issued a memorandum opinion and judgment in favor of the Trustee and Citizens.  The court found that while the Appellants had established the existence of *some* agreement regarding the Drydock stock, they had failed to prove the material terms of the 1981 Agreement.  The Appellants' timely notice of appeal followed.[6]

## IV.  DISCUSSION

By virtue of the stipulations entered into prior to trial, the issues before the bankruptcy court, and now before this Panel, are very narrow: (1) does the 1981 Agreement exist and (2) if the 1981 Agreement exists, what are its material terms?  Specifically, did the 1981 Agreement contain a provision which prohibited the Debtor from pledging the Trust's stock to Citizens?  As the parties

---

[5] The Appellants expressly represented to the bankruptcy court that they were not relying directly on the 2003 document in support of their rights with respect to the pledged stock, but rather that the 2003 document was secondary evidence of the existence and terms of the 1981 Agreement.

[6] The Debtor did not join in this appeal.  On April 9, 2008, the Debtor, *pro se*, filed a Motion for Lack of Jurisdiction and Lack of Standing.  On October 22, 2008, the bankruptcy court entered an order denying the Debtor's motion.  The Debtor, *pro se*, appealed that order to this Panel.  On June 18, 2009, we issued an opinion affirming the bankruptcy court's order denying the Debtor's motion finding that both the Trustee and Citizens had standing.  The Appellants in this appeal also challenged the standing of Citizens to bring its claims.  At oral argument, Appellants' counsel conceded that the issue is moot as our previous decision finding that Citizens indeed has standing is now the law of this case.  *See Consolidation Coal Co. v. McMahon*, 77 F.3d 898, 905 n.5 (6th Cir. 1996) (under the law of the case doctrine, court is ordinarily precluded from re-examining issues previously decided in the same case); *In re The George Worthington Co.*, 921 F.2d 626, 628-29 (6th Cir. 1990) ("The purpose of the doctrine of law of the case is to promote judicial comity, the judicial system's interest in finality, and the efficient administration of cases.").

11

seeking to enforce the alleged transfer or pledge restrictions of the 1981 Agreement, the Appellants bore the burden of proving, by a preponderance of the evidence, its existence. *Woodman Design Group, Inc. v. Homesteads of Newtown, LLC*, 2003 WL 22272596 (D. Conn. Sept. 30, 2003); *see also Lincoln Elec. Co. v. St. Paul Fire & Marine Ins. Co.*, 210 F.3d 672, 688 (6th Cir. 2000) (anticipating that Ohio Supreme Court would apply preponderance of evidence standard); *Kohler v. Taco Eds, Inc. (In re Taco Eds, Inc.)*, 41 B.R. 693, 696 (Bankr. N.D. Ohio 1984).[7]

Ohio law does not require that a contract be reduced to writing. The essential elements of a contract under Ohio law are "an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration." *Minster Farmers Coop. Exch. Co. v. Meyer*, 884 N.E. 2d 1056, 1061 (Ohio 2008). "The most basic requirement for the formation of a contract is a meeting of the minds or mutual assent to the terms of an agreement," and a clear understanding by both parties of the terms of the agreement and the intention to be bound by those terms. *Taco Eds, Inc.*, 41 B.R. at 695. The parties to a contract may establish a meeting of the minds through their testimony. *See, e.g., Giurbino v. Giurbino*, 626 N.E. 2d 1017, 1026 (Ohio Ct. App. 1993) ("Based on the testimony . . . we conclude that the requisite meeting of the minds was present to form a contract . . . .").

In determining the disputed issue of fact as to whether the 1981 Agreement exists, the bankruptcy court concluded:

> The [Appellants] presented extensive evidence regarding the meeting of their minds back in 1981 on the concept of a buy-sell agreement. Of course, this testimony could be viewed as self-serving. Corroborating their testimony, however, are the references to the 1981 Agreement in other pre-pledge documents, such as the April 1984 last will and testament of Mark Oakley and the letter dated February 3, 1994 from Mark Oakley to his attorney, Robin Hoke. The will and the letter could be construed as evidence only that Mark Oakley believed that there was a 1981 Agreement and not

---

[7] The Ohio Supreme Court has not decided whether the preponderance of evidence or clear and convincing evidence standard is proper to prove the existence of a contract. The Sixth Circuit Court of Appeals has anticipated that it would apply the preponderance of evidence standard. In the absence of binding precedent on the issue, we will follow the Sixth Circuit as did the bankruptcy court.

12

necessarily that their was a meeting of the minds. But also corroborating the testimony are the legends on the Drydock stock certificates. *Taken together, the evidence appears to support the existence of some kind of agreement restricting the transfer of some of the stock in Drydock in some manner.*

(Appellants' App. at 270-71.) (emphasis added.) The bankruptcy court's conclusion is reasonably supported by the evidence in the record before us. The court did not err in finding that *some* type of agreement existed.

Although a writing is not required to form a contract under Ohio law, the Appellants based their arguments concerning the contents of the 1981 Agreement upon the existence of a written contract. Because they could not present the original writing as required by the "best evidence rule" pursuant to Federal Rule of Evidence 1002, they sought to introduce secondary evidence of the terms of the 1981 Agreement pursuant to Federal Rule of Evidence 1004(1). While concluding that the Appellants were entitled to introduce secondary evidence, the bankruptcy court noted that such evidence must give it

> more to go on than 'sheer speculation.' *Harrow Prods., Inc. v. Liberty Mut. Ins. Co.*, 64 F.3d 1015, 1021 (6th Cir. 1995) ("[W]e cannot state that a party can never prove the terms of [an insurance] policy without a copy of the policy or a reasonable facsimile thereof. But the party trying to do so certainly faces a formidable burden. Here no jury could find, absent sheer speculation, the scope of coverage . . . and all other aspects of the policy, on which coverage often hinges.")

(Appellants' App. at 275.) Having so noted, the bankruptcy court concluded that:

> The [Appellants] demonstrated that the brothers probably agreed to the concept of a buy-sell agreement in some form. The [Appellants], however, failed to carry their burden of proving the material terms of that agreement. The testimony showed that one of the Oakleys drafted a buy-sell agreement for a client and that the Oakleys were successful in locating a copy of that other agreement. Given this, they have not shown by a preponderance of the evidence that the marks on the form buy-sell agreement introduced into evidence from the Ohio Transaction Guide related to the 1981 Agreement. The [Appellants] also failed to prove that the Debtor - as opposed to his sons - was

13

subject to whatever restrictions were set forth in the 1981 Agreement. Mark Oakley's will referenced an agreement among him, his brothers and Drydock, but did not mention the Debtor or the Trust as being parties to the agreement. Moreover, the Debtor did not act as though he believed that he or the Trust was subject to the 1981 Agreement. The Debtor not only pledged the Pledged Stock to Citizens, he signed an affidavit representing to Citizens that he had the authority to do so. In addition, the documents governing the Trust, some of which the Debtor executed after the 1981 Agreement allegedly was created, were inconsistent with the Debtor's purported obligations under the 1981 Agreement and did not even reference the 1981 Agreement.

(Appellants' App. at 275-76.) (footnote omitted.)

Finally, because Mark Oakley stated in his February 3, 1994, letter to his attorney that there was a life insurance policy on the Debtor, "face amount $250,000, the stated purchase price for the trust shares," the bankruptcy court found that the Appellants also failed to prove that the purchase price for the pledged stock was $400 per share as they asserted. The court concluded that the Appellants failed "to prove either of the material terms of the 1981 Agreement: price or restriction on the transfer of shares by the Debtor." (Appellants' App. at 277.)

The Appellants urge this Panel to reverse the bankruptcy court's factual findings because they believe that the bankruptcy court did not give "adequate weight to the most probative evidence . . . the endorsement on the stock certificate itself." (Appellants' Br. at 24.) In support of their assertion that the bankruptcy court misconstrued the evidence in reaching its findings, the Appellants merely recite the facts and attempt to provide alternative interpretations of the evidence.[8] Such alternative interpretations, or differing views, of the evidence do not constitute clear error. *Thurman v. Yellow Freight Systems, Inc.*, 90 F.3d 1160, 1166 (6th Cir. 1996) ("Where there are two permissible views

---

[8] For example, they attempt to explain that Mark Oakley's will would not mention the Debtor or the Trust as parties to the 1981 Agreement because the Debtor was not a shareholder, and it referenced Timothy Oakley, the trustee of the Trust. The Appellants also attempt to explain that the Debtor may have signed the affidavit asserting his authority to pledge the stock "[p]erhaps [because he] was desperate to get the loan closed, and signed whatever [Citizens] put in front of him." (Appellants' Br. at 22-23.) Additionally, they argue that in regard to the purchase price of the shares, the bankruptcy court ignored or dismissed Mark Oakley's testimony and focused solely on his letters to Robin Hoke.

14

of the evidence, the factfinder's choice between them cannot be clearly erroneous."); *Forbes*, 372 B.R. at 334 ("When differing views of the evidence are possible, the bankruptcy court's findings cannot be clearly erroneous."). "The clearly erroneous standard does not permit this Panel to substitute its assessments of credibility in place of the explicit findings made by the bankruptcy court." *Forbes*, 372 B.R. at 334. We give particular deference to the bankruptcy court's assessments of credibility because, unlike this Panel, it had the opportunity to observe the testimony of the witnesses. *Anderson*, 470 U.S. at 575. As long as the bankruptcy court's findings are "reasonable and supported by the evidence," we may not overturn them. *Forbes*, 372 B.R. at 334.

The bankruptcy court's factual findings in this case are amply supported by the evidence. The bankruptcy court could not have determined the material terms of the 1981 Agreement absent sheer speculation. There is no mention of a restriction on transfer or pledge of shares in the purchase agreement signed by the Debtor's sons or the promissory notes signed by the sons on the same date as the alleged 1981 Agreement. There is no mention of a restriction on transfer or pledge of shares in the purchase agreement for the 25 shares which were purchased for Margaret Galvin. The Debtor revised his Trust on several occasions after the 1981 Agreement was allegedly signed; however, none of the Trust revision documents mentions the restriction on transfer or pledge of shares. In fact, the Debtor revised his Trust to provide that shares of Drydock would transfer to Saranne Oakley upon the Debtor's death, a transfer which would be prohibited by the 1981 Agreement as Saranne was never a shareholder. Additionally, the Debtor's Trust's proposed distribution upon his death contradicted the apparent provisions of the 1981 Agreement regarding the death of shareholders. Moreover, despite the fact that the Trust was already in place at the time the 1981 Agreement was signed, nothing in the 1981 Agreement addressed how the Trust's shares were to be handled as the agreement apparently addressed only individual shareholders, *i.e.*: the agreement refers to lifetime restrictions whereas the Trust has no "lifetime" and it refers to distribution upon the death of a shareholder whereas the Trust does not "die." Mark Oakley's will, which the Appellants assert supports their position, makes no reference to Margaret Galvin, the Trust, or the Debtor being subject to the 1981 Agreement.

The strongest evidence in support of the bankruptcy court's finding that the Appellants did not meet their burden of proving the essential elements of the 1981 Agreement is found in the 2003 restatement itself. The introduction to the restatement, which each of the shareholders signed, states that "they cannot precisely remember [the original agreement's] exact terms," that the shareholders intend to honor their commitments under the original agreement "*whatever* those commitments might have been, as nearly as possible," that they "*believe* that the lost agreement form was in the same form as, or very similar to, the agreement form that was found," and finally that "in the spirit of compromise, and desiring to honor their commitments under the lost agreement *as nearly as possible*." This language demonstrates that the Appellants themselves do not know exactly what the terms of the 1981 Agreement were. Their use of the form book to reconstruct this agreement is also suspect because Gregg Oakley, who allegedly drafted the original agreement, does not actually recall making the marks in the book which led the Appellants to use the form in recreating their agreement. The Appellants simply did not prove, by a preponderance of the evidence, what the terms of the 1981 Agreement were, and in particular, that the 1981 Agreement prohibited the Debtor from pledging the Trust's shares as security for his loan from Citizens. To the contrary, the evidence demonstrates that in recreating the 1981 Agreement, the Appellants themselves were engaging in mere speculation as to the material terms of the agreement.

The bankruptcy court's finding that the Appellants failed to prove that the price per share set forth in the 1981 Agreement was $400 is also supported by the evidence. The letters from Mark Oakley to Drydock's counsel in which he states that the shares are subject to a buy-sell agreement are indeed inconsistent. One states that the price per share is $400 while the other states that the face value of the 337.5 shares is $250,000 (approximately $740 per share). Mark Oakley testified that the $250,000 was an error on his part, and the Appellants assert that the bankruptcy court ignored this testimony. It is not, however, for this Panel to substitute its assessment of this witness's testimony for that of the bankruptcy court. In addition, the letter stating that the price is $400 also indicates that the price is subject to modification. Moreover, the form book from which the Appellants worked to reconstruct the agreement did not contain the purchase price and Gregg Oakley, whose handwriting is in the book, testified "I don't know what the exact terms of the purchase price provision would have been because according to the notations in the form book it,

it's indicating that that should be left blank." (Appellants' App. at 583.) Finally, Timothy Oakley testified that he had believed that the price was in fact $100, but later realized it was in fact $400, possibly because that is what his brother included in the 2003 restatement of the agreement.

## V.   CONCLUSION

For the foregoing reasons, the judgment of the bankruptcy court is AFFIRMED.